# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### March 4, 2015 Session

## MICHELLE RYE ET AL. v. WOMEN'S CARE CENTER OF MEMPHIS, MPLLC ET AL.

**Appeal by Permission from the Court of Appeals, Western Section**
**Circuit Court for Shelby County**
**No. CT00092009          Gina C. Higgins, Judge**

———————————————

**No. W2013-00804-SC-R11-CV – Filed October 26, 2015**

———————————————

We granted permission to appeal in this healthcare liability action to reconsider the summary judgment standard adopted in Hannan v. Alltel Publishing Co., 270 S.W.3d 1 (Tenn. 2008).  The Court of Appeals concluded that the Hannan standard requires reversal of the trial court's decision granting summary judgment to the defendants on certain of the plaintiffs' claims.  We hereby overrule Hannan and return to a summary judgment standard consistent with Rule 56 of the Federal Rules of Civil Procedure.  We hold, therefore, that a moving party may satisfy its initial burden of production and shift the burden of production to the nonmoving party by demonstrating that the nonmoving party's evidence is insufficient as a matter of law at the summary judgment stage to establish the nonmoving party's claim or defense.  Applying our holding to the record in this case, we conclude that the defendants are entitled to summary judgment on all the plaintiffs' claims at issue in this appeal.  Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand this matter to the trial court for entry of summary judgment on these issues and for any other proceedings that may be necessary.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Affirmed in Part and Reversed in Part; Case Remanded to the Trial Court**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and JEFFREY S. BIVINS, J., joined.  SHARON G. LEE, C.J., and JEFFREY S. BIVINS, J., each filed separate concurring opinions.  GARY R. WADE, J., filed a dissenting opinion. HOLLY KIRBY, J., not participating.

William H. Haltom, Jr., Margaret F. Cooper, and James D. Duckworth, Memphis, Tennessee, for the appellants, Women's Care Center of Memphis, MPLLC, d/b/a Ruch Clinic, and Diane Long, M.D.

Gary K. Smith and C. Philip M. Campbell, Memphis, Tennessee, for the appellees, Michelle Rye and Ronald Rye.

W. Bryan Smith, Memphis, Tennessee, John Vail, Washington, D.C., and Brian G. Brooks, Greenbrier, Arkansas, for the amicus curiae, Tennessee Association for Justice.


**OPINION**

**I. Factual and Procedural History**

On February 24, 2009, Michelle Rye and her husband Ronald Rye (collectively "the Ryes" and individually "Mrs. Rye" and "Mr. Rye") filed this health care liability action against Women's Care Center of Memphis, MPLLC d/b/a Ruch Clinic ("Ruch Clinic") and Diane Long, M.D., (collectively "Defendants"). The Ryes' lawsuit arises out of obstetrical services Dr. Long and employees of Ruch Clinic rendered to Michelle Rye in 2007 and 2008, during her pregnancy with her third child, born in early January 2008.

It is undisputed that Mrs. Rye has Rh negative blood and that, as a result, she should have received a RhoGAM injection at or near the twenty-eighth week of her third pregnancy to avoid possible medical complications and risks in future pregnancies.[1] It is also undisputed that the Defendants' failure to administer a RhoGAM injection to Mrs. Rye was a deviation from the recognized standard of acceptable professional practice and that this deviation has resulted in Mrs. Rye becoming Rh-sensitized. This condition, Rh-sensitization, is irreversible and means that Mrs. Rye's blood now contains antibodies to Rh positive blood. It is undisputed that if Mrs. Rye becomes pregnant in the future and if the fetus's blood is Rh positive, it is possible that the antibodies to Rh positive blood now present in Mrs. Rye's blood will cross the placenta and attack the fetus's red blood cells. If all these contingencies occur together—a future pregnancy, an Rh positive fetus, and

---

[1] The Ryes' third child was born healthy and without complications. "RhoGAM is a trademark of a preparation of Rh immune globulin. It is used to prevent the formation of antibodies [to Rh positive blood] in Rh negative women." Walker v. Rinck, 604 N.E.2d 591, 593 n.1 (Ind. 1992) (citing 3 Attorney's Dictionary of Medicine p. R-92 (1986)). "When an Rh negative woman is pregnant with an Rh positive child, her blood develops antibodies which do not affect the [existing] pregnancy, but can cause damage to later-conceived Rh positive fetuses. An injection of RhoGAM during the first pregnancy can prevent the formation of these antibodies." Id. (citing 3 Attorney's Dictionary of Medicine at p. R-84 (1986))

antibodies crossing the placenta—it is undisputed that the unborn fetus would face a number of risks, ranging from mild to severe.

In their complaint the Ryes alleged that they are "practicing Roman Catholics," and prior to learning of Mrs. Rye's Rh-sensitization and the potential risks it entails, they "had intended to have additional children." After learning of Mrs. Rye's Rh-sensitization, the Ryes inquired "about the possibility of a dispensation from the Catholic Church's traditional prohibition on sterilization procedures" but were "advised that a dispensation would not be given unless Mrs. Rye's life were in danger." Although the Ryes have since "leaned toward taking steps to prevent future pregnancies," their religious beliefs have prevented them from undergoing voluntary sterilization procedures or using other artificial means of birth control. The Ryes alleged that they have been placed in a state of emotional distress due to Mrs. Rye's Rh-sensitization and the severe risks it presents for any future pregnancies. The Ryes requested compensatory damages for (1) physical injuries to Mrs. Rye, such as the "disruption of the normal functioning of [Mrs. Rye's] capability to conceive unimpaired, healthy children, free from an abnormally high risk of birth defects or premature fetal death"; (2) the disruption of their family plans; (3) the infliction of emotional distress; and (4) medical expenses that may become necessary in the future to treat complications resulting from Mrs. Rye's Rh-sensitization.

As already noted, the Defendants admitted that their failure to administer a RhoGAM injection at the appropriate time during Mrs. Rye's third pregnancy amounted to a deviation from the recognized standard of acceptable professional practice and that this deviation has resulted in Mrs. Rye becoming Rh-sensitized. Nevertheless, the Defendants asserted in their answer to the Ryes' complaint, and continue to contend in this Court, that the Ryes have no existing actual injuries or damages resulting from this deviation.

On July 13, 2010, after the Ryes and Dr. Long were deposed, the Defendants filed a motion to dismiss the Ryes' complaint, or in the alternative, for summary judgment. Specifically, the Defendants alleged that the Ryes have failed to establish any existing injuries, have failed to allege future injuries to a reasonable medical certainty, have alleged future damages that are "mere possibilities and speculative," have failed to allege an actual injury sufficient to support a claim for negligent infliction of emotional distress ("NIED"), and have failed to allege or to provide expert medical or scientific proof of a serious or severe emotional injury sufficient to support a "stand-alone" NIED claim.

As support for their motion, and in the statement of undisputed material facts filed along with their motion as required by Rule 56.03 of the Tennessee Rules of Civil Procedure, the Defendants relied upon the Ryes' deposition testimony admitting that Mrs. Rye "has had no medical complications as a result of not receiving a RhoGAM injection," that she "has not seen any doctor or healthcare provider or received any

medical treatment whatsoever as a result of not receiving a RhoGAM injection," that although the Ryes "have been advised that there are possible complications that could occur because she did not receive a RhoGAM injection[], none of these complications have occurred at this time," that although the Ryes "are concerned about possible complications that might develop, they have had no emotional or psychiatric problems because of this that required any counseling or treatment."

The Defendants also relied upon the affidavit of their expert, Dr. Thomas G. Stovall, a specialist in obstetrics and gynecology, to support their motion. Dr. Stovall, who has over twenty-five-years' experience in his specialty, opined that the health risks to an Rh-sensitized woman are "extremely remote." Dr. Stovall thus opined "within a reasonable degree of medical certainty that it is more likely than not that an Rh-sensitized individual will never sustain any injuries or damages whatsoever." Dr. Stovall also opined that "the risks to a child in a future pregnancy of an Rh-sensitized mother are remote" and that "it cannot be said with any reasonable degree of medical certainty that if an Rh-sensitized woman conceives a child, there will be any injury to the child." Additionally, Dr. Stovall opined, "within a reasonable degree of medical certainty that while Mrs. Rye [has become] Rh-sensitized, she has incurred no physical injuries." Dr. Stovall additionally opined that "[t]he risks of any future injuries to [Mrs. Rye] or to a child in a future pregnancy, if such a child is conceived, are so remote that it cannot be stated with any reasonable degree of medical certainty that such injuries would in fact occur."

In a memorandum of law filed on September 2, 2010, in response to the Defendants' motion, the Ryes stated that the Defendants' negligence had injured them by causing Mrs. Rye to become Rh-sensitized, which disrupted their family plans, increased the risks to any future children they may conceive, increased the risk to Mrs. Rye should she need a blood transfusion in the future, and caused them emotional distress, which need not be proven by expert testimony because it results from Mrs. Rye's physical injury—Rh-sensitization. Along with their legal response, the Ryes submitted the affidavit of Dr. Joseph Bruner, a specialist in perinatology, which is "a subspecialty of obstetrics," involving "maternal-fetal" care in "complicated, high-risk pregnancies." Dr. Bruner opined that the Defendants' failure to administer a RhoGAM injection to Mrs. Rye amounted to a deviation from the recognized standard of acceptable professional practice and caused Mrs. Rye to become Rh-sensitized. Dr. Bruner characterized Rh-sensitization as an injury, explaining that, "[b]iologically, [Mrs. Rye] is not the same person she was before she became Rh-sensitized." According to Dr. Bruner, "[w]hen [Mrs. Rye] began her third pregnancy, she had normal blood, without the antibodies she now has in her system for life." Dr. Bruner stated that Mrs. Rye "now possesses diseased blood with antibodies introduced into her bloodstream through no fault of her own, a situation which would not have occurred had she been given a timely RhoGAM injection." Dr. Bruner stated that Mrs. Rye's Rh-sensitization has created "two areas of

concern going forward"—the risks of harm to Mrs. Rye and the risks of harm to the Ryes' unborn children.

With regard to the risks of harm to Mrs. Rye, Dr. Bruner testified as follows:

[I]f Mrs. Rye is involved in a medical emergency henceforth in which she will require a blood transfusion, she is at an increased risk of life-threatening problems. This is directly attributable to the fact that she has antibodies present in her blood which were not present before she became Rh-sensitized. Ordinarily, in an average hospital emergency treatment setting, it takes an average of 20 to 30 minutes for a blood typing and cross matching to occur. A shorter procedure, a blood type and screen, can be done approximately 10 minutes faster. The presence of Rh antibodies in Mrs. Rye's blood will double or even triple the time necessary to identify compatible units of blood for transfusions. This time difference is likely to be life threatening in an emergency situation in which blood transfusions are required. This is of particular significance because major accidents and traumatic events often occur in situations in which sophisticated medical care is not immediately physically available and time is typically of the essence to save a patient who needs an emergency transfusion or multiple transfusions.

With regard to the risks of harm to any future children the Ryes may conceive, Dr. Bruner opined:

[Rh-sensitization] can have severe consequences because of the destruction it involves of the baby's blood cells. The baby's body tries to compensate for the anemia caused by the attack from the mother's antibodies by releasing immature red blood cells, called erythroblasts. The overproduction of erythroblasts can cause the liver and spleen to become enlarged, potentially causing liver damage or a ruptured spleen. Excess erythroblast production means that fewer of other types of blood cells are produced, such as platelets and other factors important for blood clotting. Therefore, excessive bleeding can be another complication. The destroyed red blood cells release the blood's red pigment (hemoglobin) which degrades into a yellow substance called bilirubin. Bilirubin is normally produced as red blood cells die, but the body can only handle a low level of bilirubin. In erythroblastosis fetalis, high levels of bilirubin accumulate and cause hyperbilirubinemia, a condition in which the baby becomes jaundiced before birth, developing a yellowish tone of the eyes and skin. If hyperbilirubinemia cannot be controlled in the newborn, the baby develops kernicterus after birth, in which bilirubin is deposited in the brain and may cause permanent damage. Other symptoms include high levels of insulin

and low blood sugar, as well as a condition called hydrops fetalis. Hydrops fetalis causes fluids to accumulate within the baby's body, causing swelling before birth which can even cause fetal death. Hydrops fetalis inhibits normal breathing after birth and can interfere with lung growth if it continues for an extended period. Hydrops fetalis and anemia can also contribute to heart problems.

Babies of Rh-sensitized mothers who survive pregnancy may develop kernicterus, which can lead to deafness, speech problems, cerebral palsy, or mental retardation. Extended hydrops fetalis can inhibit lung growth and contribute to heart failure. These serious complications are life threatening, but with good modern medical treatment, most babies can be saved.

. . . .

I have been made aware that Mr. and Mrs. Rye are Roman Catholics and, because of their religious views, cannot undergo voluntary sterilization and do not practice birth control other than through attempted timing of sexual relations since Mrs. Rye became Rh-sensitized. However, I am also aware that pregnancies can and do occur for couples in such circumstances despite their best efforts to avoid a pregnancy, and I have been made aware that the Ryes are opposed to abortion and do not plan to have an abortion in the event of a subsequent pregnancy.

I have reviewed the Affidavit of Dr. Thomas Stovall in this case. Contrary to the opinions of Dr. Stovall, it is my opinion that it is more probable than not that unborn children of Mr. and Mrs. Rye will experience complications in a subsequent pregnancy or in subsequent pregnancies, and the degree of severity of those complications will be expected to increase with successive pregnancies because of the nature of Rh-sensitization as a condition. This is an impairment of the ability of Mrs. Rye to bear children in the future free from a series of risks the family more than likely would not have had otherwise.

Based upon my experience, education and training as a perinatologist, the usual course of treatment for the first pregnancy in a woman known to be Rh-sensitized is an amniocentesis (aspiration of fluid by needle) at 15 weeks gestation to determine the fetal blood type and confirm whether the baby is in fact Rh-positive. Assuming the baby is Rh-positive, which is more likely than not given Mrs. Rye's history, starting at 24 weeks gestation, serial amniocenteses would be expected to be conducted approximately every 3 weeks at 27, 30, 33, 36 and possibly

39 weeks gestation. Each amniocentesis carries a 1 to 2 % risk of bleeding, infection, leakage of fluid, preterm labor, and loss of the fetus, and with each amniocentesis there are expenses, discomfort to the mother because of the insertion of a needle in the abdomen, and the emotional toil, and the risk of a baby having to be delivered preterm, with accompanying risks of cerebral palsy.

A potential alternative to serial amnioenteses, or an adjunct to amnioenteses, would be one or more ultrasounds. Ultrasounds can enable the practitioner to measure fetal blood velocity effectively. Babies with a normal blood count will have blood moving at a certain speed, which is a normal velocity. The presence of anemia in a developing fetus can therefore be detected through the observation of abnormal blood velocity at approximately 22 to 24 weeks gestation, and in a developing child of an Rh-sensitized mother where anemia has been observed. A practitioner who uses ultrasounds as the principle means of monitoring such a child should conduct those ultrasounds every one to two weeks prior to delivery. The factors that influence the decision of the practitioner as to whether to do ultrasound or amniocentesis include individual risk factors as identified by the practitioner, the family's geographic access to available care, the facilities and equipment available and the level of experience and training of the doctor.

In a subsequent pregnancy, Michelle Rye's unborn child will, at a minimum, require monitoring as described above to a reasonable medical certainty. In later pregnancies, because of the nature of Rh-sensitization and the immune system's response in an Rh-sensitized patient, the risks to the babies will magnify significantly with successive pregnancies.

Based upon my education, training and experience as a perinatologist specializing in the treatment of high risk maternal-fetal patients, including treatment of many pregnant women who have been Rh-sensitized and their developing babies, the pregnancies of Rh-sensitized patients can be grouped into three broad risk categories: (1) "mild disease," in which the child will be born with minimal jaundice expected to resolve with conventional treatment shortly after birth and no need for blood transfusions, (2) "moderate disease," which will tend to involve prematurity and some degree of anemia and will require a prolonged stay in a neonatal treatment facility and blood transfusions and the use of light therapy to improve the babies' bilirubin, and (3) "severe disease," which will require aggressive treatment of the baby in utero, including monitoring of hematocrit which will fall below a level of 15-20, and will likely be accompanied by erythroblastosis fetalis and hydrops fetalis, a very serious

condition in which excess fluid accumulates around the baby's lungs, heart, and organs. Developing babies in this "severe disease" category are considered high risk, and I am often called upon in my practice as a perinatologist to provide consultation and aggressive treatment and intervention for such patients. Aggressive treatment for such babies includes many invasive diagnostic procedures and blood transfusions while the babies are still in utero. Despite the best care, such affected babies have a significantly higher risk of prematurity and temporary and permanent complications, including respiratory and central nervous system deficits, and even death.

Based upon my education, training and experience as a perinatologist specializing in the treatment of high risk maternal-fetal patients, including treatment of many pregnant women who have been Rh-sensitized and their developing babies, I have observed certain percentages of disease and risk classification. Generally, many of the children born in the first pregnancy of women after they have been Rh-sensitized will fall into the first category (mild disease), while approximately 25 to 30% of those children will fall into the second category (moderate disease), and approximately 20 to 25% of those children will fall into the third category (severe disease). However, it is my opinion that it is more probable than not that the unborn children of Mr. and Mrs. Rye will be at a greater than average statistical risk for the reasons set forth below.

Fortunately, Mr. and Mrs. Rye's third child . . . was born healthy and without adverse events. However, because of Mrs. Rye's comparatively quick Rh-sensitization (from the 28th week of her third pregnancy up until the confirmation of her Rh-sensitive status shortly after the delivery of her third child), it is my opinion to a reasonable degree of medical certainty that Mrs. Rye is a comparatively "fast responder" biologically to the changes brought about by Rh-sensitization among Rh-sensitized patients. This temporal pathway for her Rh-sensitization was prompt and the condition is now irreversible. The antibodies now contained in her body, which were not present before her Rh-sensitization, will never go away during her lifetime. It is therefore my opinion that it is more probable than not that Mrs. Rye's next pregnancy will involve a baby with moderate to severe disease in utero.

The Defendants deposed Dr. Bruner on November 29, 2010. During his deposition, Dr. Bruner elaborated on his affidavit testimony concerning the risks to Mrs. Rye and to any unborn children the Ryes may conceive in the future. Excerpts of his deposition testimony appear below.

Q. Okay. You and I are communicating. Let me make it clear. I've asked you if you're called as an expert in this case what opinions you will render, and you've told me that your testimony—tell me if I state this correctly—your testimony would be about the risk that Mrs. Rye has and any unborn child of her[s] would have if another child were conceived. Did I make that statement correctly: That's the subject matter of your testimony?

A. That's correct.

Q. All right. And, specifically, I hear you say three points. Number one, that Mrs. Rye became R[h-]sensitized in her third trimester of her last pregnancy because of the failure to receive a RhoGAM injection; number two, she now has lifetime risks, whether she becomes pregnant again or not; and number three, if she becomes pregnant again, she and her fetus will have risks.

A. That's correct.

Q. Did I state those correctly?

A. Yes, you did.

. . . .

Q. All right. Now, I want to give you every opportunity before we leave here today to tell me the basis in each of those areas, so go ahead.

A. Okay. As far as the sensitization, itself, everything I've read so far, there appears to be general agreement that she was sensitized in her last pregnancy because of her doctor's failure to administer RhoGAM, so I don't think we need to spend much time on that.

Her lifetime risk is because of the fact that the R[h] disease she now has, that she has circulating antibodies to the R[h] factor. If she ever requires a blood transfusion or requires a blood product in the future, it will be necessary for her to be administered blood or blood products that do not have the R[h]factor, or else it would provoke a response in her body.

. . . .

So this is only a risk if she is in an emergency situation, for example, if she's in a motor vehicle accident, or if she falls down the stairs or has some sort of injury, perhaps even during a childbirth that would result in a large acute blood loss that requires an urgent or emergent blood transfusion as a life-saving procedure. Then the risk for her is that the turnaround time to produce compatible blood may not be fast enough to prevent injury or even death.

. . . .

Q. And I'm not—when I say this, I'm just trying to nail it down. You're not going to testify at this trial that she has any—if you're called as a witness at this trial, that she has currently any other risk in her current, nonpregnant situation, any other risks than the risk, if she had blood loss, of the transfusion process being prolonged, correct?

A. That's the only medical risk that she has, yes, sir.

. . . .

Q. On the current risk that she has, the only risk that she has right now in her current situation, is this risk that it might take longer to process her blood in the case of—or blood products in the case of a transfusion?

A. It would take longer to process a unit of blood.

. . . .

Q. Fair enough. Let's go to your third opinion. You say if she becomes pregnant, she and her fetus both have risks. Tell me specifically what your opinions are in this regard.

A. Well, there are risks from the disease, and there are risks from the treatment of the disease. The risk of the disease centers mainly on the fetus. With her next R[h] incompatible pregnancy, her immune response will be stronger than it was in her last pregnancy, so she will produce antibodies that will cross the placenta, and they will attach to the fetal red blood cells. And these red blood cells will be destroyed, and the fetus will experience some degree of anemia.

- 10 -

Q. Okay. Anything else?

A. Depending on the degree of anemia, the fetus may be required—in order to replace the blood cells that are being destroyed, the fetus ma[y] be required to convert other organs that do not normally produce blood into blood-producing organs, specifically, the liver, the spleen, under severe circumstances, even the lining of the bowel. The conversion of these cells being forced to do something they were not normally programmed to do is injurious.

Q. Injurious to the fetus?

A. Yes, injurious to the cells, injurious to the organ and injurious to the entire fetus. And this injury can lead to an accumulation of fluid within the fetus because of impaired blood flow and eventually to a condition known as hydrops fetalis . . . .

Q. What is that?

A. It's a collection of fluid in more than one body space in a fetus as a result of severe anemia, provoked by an immune response.

Q. Okay.

A. Left untreated, this may lead to fetal death.

Q. Left untreated?

A. Yes.

Q. What if it's treated?

A. Then a variety of outcomes are possible. Left untreated, and even if treated, it can lead to maternal illness. The way this happens is, if the fetus develops hydrops fetalis, the placenta does, also, because the placenta belongs to the fetus. And in descriptions—in pathological descriptions of fetuses that have been sick with hydrops fetalis or have died, one common feature is a very thick placenta, a placenta that's also hydropic. The placenta produces many basal-active substances, not only for the fetus, but ones that affect the mother, as well. So when the placenta becomes thick and edematous, the mother commonly develops high blood pressure,

- 11 -

fluid retention and proteinuria, something very closely akin to preeclampsia, and so the mother becomes sick, as well.

Q.  Go ahead. What else?

A.  Well, if left untreated, this will typically result in death of the fetus if it's that severe.

Q.  If left untreated?

A.  Yes.

Q.  Okay.

A.  So those are the risks to the fetus from the disease process. So this can result in an early loss, it can result in a loss after viability, it can result in an emergency delivery that, unfortunately, may result in the loss of the baby, in spite of the emergency delivery.

And so the mother may secondarily be injured because of the disease process that the fetus has or because of the treatment of the disease . . . .

. . . .

A.  Finally, as I mentioned, all of these procedures, all of these invasive procedures have complications. And although it's probably not worthwhile going through every scenario, just by way of illustration, it's possible that an amniocentesis or blood sampling could be performed at 23 weeks, 24 weeks, a complication could occur, the baby would deliver and survive but then be severely affected by prematurity, which is not a result of the disease process, but a complication of the treatment of the disease. And the baby could survive and be severely affected with cerebral palsy or even mental retardation and then live for [forty] years after that.

So that pretty much sums up the risks of the fetus and the mother, both from the disease and from the treatment . . . .

. . . .

Q.  Okay. So you can't say it's more likely than not that if she becomes pregnant again, and if the – and if the baby has blood incompatible

- 12 -

with her R[h] [negative] status that the baby is not going to be treated for this?

A. No.

Q. You're not saying that?

A. In this country, more than likely, she would get treatment.

Q. All right.

A. But the interlude until treatment begins may result in a pregnancy loss.

Q. But that's not a risk that you're prepared to testify that more likely than not is going to occur?

A. No, I don't think so.

Q. Can you say that any of these things you've told us about today are more likely than not going to occur to her in the future?

A. Yes.

Q. What? How can you say that?

A. It's more likely than not that she will become pregnant with another sensitized pregnancy.

Q. Okay. And what is the basis for your statement that this lady, it's more likely than not that she's going to become pregnant again with a child that will have blood not compatible with her R[h] [negative] status?

A. Because of her religious beliefs, she's not allowed to practice contraception, so she and her husband are still having unprotected intercourse.

Q. How do you know that?

A. Because she testified to that in her deposition. So at least –

Q.     And you're working on the assumption that there's unprotected intercourse going on now. You're working on that assumption?

A.     Well, she testified under oath that there was unprotected –

Q.     But you're testifying that's an accurate statement?

A.     Yeah, I am.

. . . .

Q.     And she's—more likely than not, it's going to be a child whose blood is not compatible with her R[h] [sensitized] status. You're saying that's more likely than not, more than a 50 [%] chance of that?

A.     That's correct.

. . . .

A.     So more likely than not, she will become pregnant again, because she's already become pregnant three times, having unprotected intercourse. More likely than not, the fetus will be affected in at least one or more future pregnancies because of the simple fact that R[h-]positive men, 40 [%] are homozygous, 60 [%] are heterozygous. Over all, there's a 70 [%] chance her pregnancy will be affected . . . .

. . . .

Q.     But that's as far as you can go. It's more likely than not that she'll get pregnant, and it's more likely than not that the baby will have blood incompatible, and it's more likely than not that that will mean that the baby will have some—some what?

A.     Let me try to be more specific.

Q.     Thank you.

A.     Okay. So it's more likely than not, she'll become pregnant. It's more likely than not, the baby will be incompatible. It's more likely than not, the disease will be moderate to severe, which means that more likely than not, invasive procedures will begin in the late

- 14 -

second trimester, between 24 and 28 weeks, and these invasive procedures will occur every seven to ten days, more or less, for the remainder of the pregnancy, each of those events with a one-to-two percent risk.

Dr. Stovall was deposed on February 24, 2011. During his deposition, Dr. Stovall reiterated the opinion he had previously expressed in his affidavit, that, while Mrs. Rye has become Rh-sensitized, she has not incurred physical injury or sustained damages as a result of the Rh-sensitization. Dr. Stovall testified that unless she becomes pregnant again, there is no risk at all to Mrs. Rye from the Rh-sensitization. Dr. Stovall agreed that, if Mrs. Rye becomes pregnant in the future and the fetus dies or suffers from cerebral palsy or some other serious complication from the Rh-sensitization, the Ryes would, at that point, have suffered harm from the Defendants' failure to administer a RhoGAM injection. Dr. Stovall further testified that if Mrs. Rye becomes pregnant in the future, there is a 40% chance "that she will develop enough antibodies that those antibodies will cross the placenta and cause the baby to have or to require the baby to have additional monitoring." Even if additional monitoring is required, however, Dr. Stovall testified that "more likely than not, like overwhelmingly—overwhelmingly, more likely than not, [Mrs. Rye] would not have any complications."

On July 15, 2011, the trial court held a hearing on the Defendants' motion to dismiss, or in the alternative, for summary judgment. At the conclusion of the hearing, the trial court announced its decision to grant the Defendants' motion as to all claims for future damages to Mrs. Rye arising from blood transfusions or future pregnancies. On August 10, 2011, the trial court, consistent with its bench ruling, entered an order granting the Defendants' motion as to "all claims for future damages for injuries to [Mrs.] Rye that relate to prospective injury relating to blood transfusions or future pregnancies." The trial court found that such damages had yet to be sustained and that "it is a matter of speculation whether they will ever be sustained." The trial court denied the Defendants' motion on the issues of whether the Ryes "ha[d] suffered emotional distress and [whether Mrs.] Rye has R[h] disease because of the claimed negligence of the [D]efendants." However, during the July 15, 2011 hearing, the trial court invited the Defendants to renew their motion for summary judgment after discovery had been completed. A scheduling order the trial court entered on March 10, 2011, provided the following 2011 discovery deadlines: April 1–written discovery; May 1–disclosures of the Ryes' expert witnesses; June 1–disclosures of the Defendants' expert witnesses; July 1–fact witness depositions and discovery depositions of the Ryes' expert witnesses; August 1–amended pleadings; September 1–discovery depositions of defense experts.

On January 24, 2012, after the discovery deadlines had passed and approximately two weeks prior to the scheduled trial date, the Defendants renewed their request for dismissal or summary judgment by filing a supplemental memorandum in support of their motion. The Defendants again argued that Mrs. Rye has no present injury or illness as a

result of their failure to administer a RhoGAM injection. The Defendants argued that the Ryes' allegations regarding emotional distress amount to "stand-alone" NIED claims requiring expert proof of a severe or serious emotional injury and that the Ryes had "developed no proof to support [their] claim[s]." According to the Defendants, the Ryes "ha[d] been given ample opportunity to develop proof in this case that they have, in fact, sustained actual damages as a result of the failure of the [D]efendants to administer a RhoGAM injection. The [Ryes] have proved no such damages."

The trial court heard arguments on the Defendants' renewed motion on the morning of February 6, 2012—the date trial was scheduled to begin. The trial court reaffirmed its earlier ruling that a genuine dispute of material fact existed as to whether Mrs. Rye's Rh-sensitization constituted a physical injury for purposes of her NIED claim, citing Dr. Bruner's testimony that there had "been a change in her blood." However, the trial court concluded that the undisputed facts showed that Mr. Rye had sustained no physical injury. As a result, the trial court ruled that Mr. Rye has no independent cause of action and dismissed Mr. Rye's NIED claim. Counsel for the Ryes then orally moved the trial court to grant an interlocutory appeal. The trial court agreed to do so and indicated that it would permit the parties to seek an interlocutory appeal on all issues that had been addressed in its rulings on the Defendants' motion.

On November 28, 2012, the trial court entered an order consistent with its bench ruling. Specifically, the trial court denied the Defendants' summary judgment on the issue of whether Mrs. Rye had suffered a physical injury for purposes of her NIED claim. The trial court clarified that Mrs. Rye would not be precluded "from presenting evidence of how her family plans [had] changed as an element of damages going to emotional distress." The trial court granted the Defendants summary judgment with regard to: (1) Mr. Rye's "stand-alone" NIED claim that was not supported by the required expert testimony; and (2) the Ryes' independent cause of action for disruption of family planning.

On December 26, 2012, the Ryes filed a motion in the trial court seeking permission to pursue an interlocutory appeal on six issues. Two days later, the Defendants filed their own motion seeking the trial court's permission for an interlocutory appeal on two issues. On March 22, 2013, the trial court entered separate orders granting both motions and listing five of the six issues requested by the Ryes and both of the issues requested by the Defendants. Thereafter, the Ryes and the Defendants filed separate Tennessee Rule of Appellate Procedure 9 applications for permission to appeal.

On May 24, 2013, the Court of Appeals granted both applications and limited its review to the following issues:

1. Since the Defendants have admitted that the failure to provide a RhoGAM injection to [Mrs.] Rye was a deviation from the recognized standard of acceptable professional obstetric and gynecological practice, whether the trial court properly granted partial summary judgment to the Defendants as to the [Ryes'] claims that the Ryes' future children are at risk for complications and [Mrs.] Rye is at risk for harm in the event of future blood transfusions as set forth in the Affidavit and deposition testimony of [Dr.] Bruner [ ], based upon the court's findings that such risks are too speculative to be submitted to the jury;

2. Whether the trial [c]ourt properly denied summary judgment to the Defendants as to claims that [Mrs.] Rye has "diseased blood" or Rh disease and therefore has an injury in the form of an altered bodily status;

3. Whether the trial [c]ourt properly denied summary judgment to the Defendants as to the claim that [Mrs.] Rye has suffered emotional distress, as such claim is not a "stand-alone" [NIED] claim under Tennessee law;

4. Whether the trial [c]ourt properly granted summary judgment to the Defendants as to the claim that [Mr.] Rye has suffered emotional distress, as such claim is a "stand[-]alone" [NIED] claim under Tennessee law; and,

5. Whether the fundamental right of procreation in Tennessee articulated in Tennessee case law, e.g. Davis v. Davis, 842 S.W.2d 588, 600–01 (Tenn. 1992), confers any right of action or remedial damages for disruption of family planning due to impairment of reproductive capacity, and whether the right belongs only to a woman or also to a man.

Because this lawsuit was filed in 2009, the Court of Appeals evaluated the trial court's ruling on the Defendants' summary judgment motion pursuant to the standards adopted in Hannan v. Alltel Publ'g Co., 270 S.W.3d 1 (Tenn. 2008), rather than the standards in Tennessee Code Annotated section 20-16-101 (Supp. 2014), which applies to actions filed on or after July 1, 2011.[2] Rye v. Women's Care Ctr. Of Memphis, MPLLC, No. W2013-00804-COA-R9-CV, 2014 WL 903142, at *5 n.9 (Tenn. Ct. App. Mar. 10, 2014). The Court of Appeals affirmed in part and reversed in part the trial court's ruling. Specifically, the Court of Appeals affirmed the denial of summary judgment on the issue of whether Mrs. Rye has suffered a physical injury entitling her to bring a stand-alone NIED claim, without supporting the claim with expert proof. Id. at *8, 20. The Court of Appeals also affirmed the trial court's grant of summary judgment to the Defendants on the Ryes' independent cause of action for disruption of family

---

[2] Act of May 20, 2011, ch. 498, 2011 Tenn. Pub. Acts § 3 at 471.

planning and Mrs. Rye's claim for future medical expenses associated with possible future blood transfusions. Id. at *13-16. Nevertheless, the Court of Appeals reversed the trial court's grant of summary judgment to the Defendants on Mrs. Rye's claim for future medical expenses associated with future pregnancies and on Mr. Rye's NIED claim. Id. at *11-12, *24. With respect to Mrs. Rye's claim for future medical expenses associated with future pregnancies, the Court of Appeals was "reluctant to conclude" that Mrs. Rye's proof was "anything more than contingent and speculative." Id. at *11. The Court of Appeals explained, however, that Hannan had "created a particularly high standard" for defendants seeking summary judgment, id., and concluded that the Defendants had failed to "disprove[]" an essential factual claim and thus had failed to meet the high Hannan standard. Id. at *12. The Court of Appeals agreed with the trial court that Mr. Rye had alleged only a "stand-alone" NIED claim, which requires expert proof to prevail at trial. Nevertheless, based on the "high burden of the Hannan standard," id. at *24, the Court of Appeals held "that Mr. Rye's failure to submit expert proof to support his NIED claim prior to the trial in this case is not sufficient to support a grant of summary judgment." Id.

The Defendants filed an application for permission to appeal from the Court of Appeals' decision, pursuant to Tennessee Rule of Appellate Procedure 11. This Court granted the Defendants' application, and, in addition to the issues raised in the application, directed the parties to address the question of whether the summary judgment standard articulated in Hannan should be reconsidered. Rye v. Women's Care Ctr. of Memphis, MPLLC, No. W2013-00804-SC-R11-CV (Tenn. Sept. 19, 2014) (order directing the parties to brief whether Hannan should be reconsidered).

## II. Analysis

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997); see also Abshure v. Methodist Healthcare-Memphis Hosp., 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. Estate of Brown, 402 S.W.3d 193, 198 (Tenn. 2013) (citing Hughes v. New Life Dev. Corp., 387 S.W.3d 453, 471 (Tenn. 2012)). Before making a fresh determination in this appeal, we must first identify the standards that guide our de novo review. To do so, we will review the history of summary judgment, including the adoption of Rule 56 of the Tennessee Rules of Civil Procedure ("Tennessee

Rule 56"), the three seminal decisions of the United States Supreme Court[3] discussing the standards that apply in summary judgment practice, the decision in Byrd v. Hall, 847 S.W.2d 208 (Tenn. 1993), and the confusion it engendered, and reconsider whether the standard articulated in Hannan is consistent with the history of summary judgment and the text of Tennessee Rule 56.

## *B. History of Summary Judgment in Tennessee*

### *1. Adoption of Tennessee Rule of Civil Procedure 56*

The comprehensive history of summary judgment practice in Tennessee has been provided in prior decisions of this Court and in law review articles. See, e.g., Byrd v. Hall, 847 S.W.2d 208 (Tenn. 1993); Judy M. Cornett, Trick or Treat? Summary Judgment in Tennessee after Hannan v. Alltel Publishing Co., 77 Tenn. L. Rev. 305 (2010) [hereinafter Cornett's Summary Judgment in Tennessee]. For purposes of this appeal, the following historical overview will suffice.

Summary judgment in the modern sense first became available in Tennessee on January 1, 1971, with the adoption of Tennessee Rule 56. Allstate Ins. Co. v. Hartford Accident & Indem. Co., 483 S.W.2d 719, 719 (Tenn. 1972); see also Byrd, 847 S.W.2d at 210. At the time of its adoption, Tennessee Rule 56 was essentially identical to the corresponding Rule 56 of the Federal Rules of Civil Procedure ("Federal Rule 56") then in effect. Tenn. R. Civ. P. 56.01 advisory commission cmt.; Bowman v. Henard, 547 S.W.2d 527, 530 (Tenn. 1977). Tennessee Rule 56 was hailed as "one of the most important and desirable additions to Tennessee procedure contained in the Rules of Civil Procedure" and described as "a substantial step forward to the end that litigation may be accelerated, insubstantial issues removed, and trial confined only to genuine issues." Byrd, 847 S.W.2d at 210 (quoting Tenn. R. Civ. P. 56 advisory commission cmt.) (internal quotation marks omitted); see also Donald W. Pemberton, Tennessee Rules of Civil Procedure, 4 Mem. St. U. L. Rev. 211, 215 (1974); Donald F. Paine, Recent Developments in Tennessee Procedure: The New Tennessee Rules of Civil Procedure, 37 Tenn. L. Rev. 501, 516 (1970). Early decisions construing Tennessee Rule 56 likewise emphasized the importance of summary judgment as a rapid and inexpensive means of resolving issues and cases where no genuine issues of material fact existed. See, e.g., Bowman, 547 S.W.2d at 529; Evco Corp. v. Ross, 528 S.W.2d 20, 24 (Tenn. 1975).

---

[3] Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). These three decisions are known collectively as "the trilogy." Adam N. Steinman, The Irrepressible Myth of Celotex: Reconsidering Summary Judgment Burdens Twenty Years After the Trilogy, 63 Wash. & Lee L. Rev. 81, 82 (2006). We will refer to these decisions as the Celotex trilogy in this opinion.

## 2. *The Celotex Trilogy*

Tennessee Rule 56 remained essentially identical to its federal progenitor in 1986, when the United States Supreme Court issued the Celotex trilogy addressing summary judgment practice under Federal Rule 56. In Matsushita Electric Industrial Company v. Zenith Radio Corporation, decided first, the Supreme Court elaborated on the showing required for a plaintiff to survive a summary judgment motion. The Court observed that, when the moving party carries its "burden under Rule 56(c)," then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" 475 U.S. at 586 (quoting Fed. Rule Civ. Proc. 56(e)). To satisfy this burden, the nonmoving party must do "something more than simply show that there is some metaphysical doubt as to the material facts." Id. Further, the Court explained that, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In Anderson, the Court explained the role the burden of proof at trial plays in summary judgment practice and how the substantive law regarding a claim or defense affects the determination of which facts are "material" and which factual disputes are "genuine" for purposes of Rule 56. 477 U.S. at 247-48. The Court stated that "the substantive law will identify which facts are material" and clarified that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Materiality, the Court explained, is "only a criterion for categorizing factual disputes in their relation to the legal elements of the claim, and not a criterion for evaluating the evidentiary underpinnings of those disputes." Id. The Court emphasized that disputes of material fact are "genuine"—and therefore preclude the entry of summary judgment—only if the evidence produced at the summary judgment stage "is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court held that this standard "mirrors the standard for a directed verdict." Id. at 250. Accordingly, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. Anderson instructed that summary judgment may be granted when the evidence supporting the plaintiff's claim "is merely colorable or is not significantly probative." Id. at 249-50 (citation omitted). The Court further explained:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is

[evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

Anderson, 477 U.S. at 252 (quoting Improvement Co. v. Munson, 14 Wall 442, 448 (1872)).

In these first two cases of the Celotex trilogy, the Court assumed without deciding that the moving defendants had met their initial burdens under Federal Rule 56. Anderson, 477 U.S. at 250 n.4; Matsushita Elect. Indus. Co., 475 U.S. at 586 n.10. In Celotex, decided the same day as Anderson, the Supreme Court had the opportunity to address the burden of production a moving party bears in summary judgment practice.

Mrs. Catrett sued in September 1980, alleging that her husband's death had resulted from his exposure to products containing asbestos manufactured or distributed by Celotex and other named corporations. Celotex, 477 U.S. at 319. A year after the suit was filed, Celotex moved for summary judgment, contending that Mrs. Catrett had "failed to produce evidence" showing that any Celotex product "was the proximate cause" of her husband's wrongful death. Id. Celotex did not support its motion with affidavits but instead based its motion on Mrs. Catrett's *failure to identify*, when "answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to [Celotex's] asbestos products." Id. at 320. Mrs. Catrett responded to Celotex's summary judgment motion with three documents, including a transcript of her husband's deposition, a letter from an official of one of her husband's former employers whom Mrs. Catrett planned to call as a trial witness, and a letter from an insurance company to Celotex's attorney. Id. According to Mrs. Catrett, all of these documents suggested that her husband had been exposed in 1970 and 1971 to asbestos products that were manufactured by Celotex. Id. Celotex asked the federal district court not to consider Mrs. Catrett's response because the three documents she supplied amounted to inadmissible hearsay. Id. In July 1982, the federal district court granted Celotex's motion for summary judgment, and Mrs. Catrett appealed. Id. at 321-22. The Circuit Court of Appeals for the District of Columbia reversed and held that the summary judgment motion was fatally defective because Celotex had "made no effort to adduce any evidence, in the form of affidavits or otherwise, to support its motion." Id. at 321 (emphasis in original omitted). The Court of Appeals did not address whether Mrs. Catrett's response to the motion had been sufficient.

The Supreme Court granted certiorari and ultimately reversed the Circuit Court of Appeals' judgment and remanded to that court for further proceedings. Id. at 328. Although the Court was split five-to-four on the decision to reverse the Court of Appeals, eight of the nine justices agreed on how the burdens of production and persuasion should function in summary judgment practice. See Id. at 322-27 (Rehnquist, J., majority

opinion); Id. at 328 (White, J., concurring); Id. at 329, 334 (Brennan, J., dissenting).[4] The justices disagreed only as to the result that should pertain when the agreed upon standards were applied to the facts of the case.

Justice Rehnquist, writing for the majority, stated:

We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.* In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

. . . .

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment "*with or*

---

[4] Justice Stevens also dissented in Celotex, but he did not discuss in detail summary judgment practice under Federal Rule 56. See 477 U.S. at 337 (Stevens, J., dissenting).

*without supporting affidavits*" (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.

477 U.S. at 322-23 (first emphasis added) (footnote omitted) (quoting Fed. R. Civ. P. 56). The Celotex majority emphasized that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Where the moving party satisfies this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). However, a nonmoving party need not "produce evidence in a form that would be admissible at trial" or "depose her own witnesses" to survive a summary judgment motion. Id. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing" required to avoid summary judgment. Id. The majority also pointed out that a nonmoving party confronted with a "premature motion for summary judgment" may invoke Federal Rule 56(f), which, at that time, "allowe[d] a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party ha[d] not had an opportunity to make full discovery." Id. at 326. A summary judgment motion "may, and should, be granted," the Celotex Court reiterated, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323. The Celotex Court emphasized that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Id. at 327 (quoting Fed. R. Civ. P. 1). Accordingly, the Celotex majority declared that Federal Rule 56 should "be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." Id. The Supreme Court remanded the case to the Circuit Court of Appeals to consider the adequacy of the three documents Mrs. Catrett had submitted in response to Celotex's motion. Id.

Justice White, who supplied the fifth vote for the majority decision, also filed a short concurring opinion, in which he agreed that "the Court of Appeals was wrong in holding that the moving defendant must always support [its] motion with evidence or

affidavits showing the absence of a genuine dispute about a material fact." 477 U.S. at 328 (White, J., concurring). Justice White also concurred with the majority that a defendant moving for summary judgment "may rely on depositions, answers to interrogatories, and the like, to demonstrate that the plaintiff has no evidence to prove his case and hence that there can be no factual dispute." Id. Justice White emphasized, however, that "[i]t is not enough to move for summary judgment *without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.*" Id. (emphasis added). Justice White cautioned that, although a nonmoving party may be required to respond to a summary judgment motion, "he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit." Id. Justice White concurred in reversing and remanding to the Court of Appeals for consideration of the adequacy of Mrs. Catrett's response to Celotex's motion. Id. at 329. Justice White agreed to this disposition because Celotex had conceded that, if Mrs. Catrett had named a witness to support her claim, summary judgment would have been inappropriate unless Celotex somehow showed "that the named witness'[s] possible testimony raise[d] no genuine issue of material fact" and because Mrs. Catrett had not argued that she had no obligation to reveal her witnesses and evidence but had instead insisted "that she ha[d] revealed enough to defeat the motion for summary judgment" by her three-document response. Id. at 328.

Justice Brennan filed a dissenting opinion in Celotex, which Chief Justice Burger and Justice Blackmun joined. Id. at 329 (Brennan J., dissenting). Although Justice Brennan did "*not disagree* with the Court's legal analysis," he dissented from "the Court's judgment" because he believed that Celotex had not met "its burden of production under Federal Rule of Civil Procedure 56." 477 U.S. at 329 (Brennan, J., dissenting) (emphasis added). Justice Brennan also faulted the Court for "not clearly explain[ing] what is required of a moving party seeking summary judgment on the ground that the nonmoving party cannot prove its case." Id. Justice Brennan used his dissenting opinion "to explain more clearly" what is required in such circumstances, stating as follows:

> If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Second, the moving party may demonstrate to the [c]ourt that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.* If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party—who will bear the burden of persuasion at trial—has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, *as the Court confirms*, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. *If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record.* Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion. Accordingly, the nonmoving party may defeat a motion for summary judgment that asserts that the nonmoving party has no evidence by calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking all the record evidence allegedly supporting the nonmoving party that a party seeking summary judgment satisfies Rule 56's burden of production. Thus, if the record disclosed that the moving party had overlooked a witness who would provide relevant testimony for the nonmoving party at trial, the Court could not find that the moving party had discharged its initial burden of production unless the moving party sought to demonstrate the inadequacy of this witness' testimony. Absent such a demonstration, summary judgment would have to be denied on the ground that the moving party had failed to meet its burden of production under Rule 56.

477 U.S. at 331-33 (Brennan, J., dissenting) (footnote and citations omitted) (emphasis added).

Justice Brennan explained that, "once the moving party has attacked whatever record evidence—if any—the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence

attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." Id. at 332 n.3. According to Justice Brennan, "[s]ummary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." Id. After providing this explication of his view of the law, Justice Brennan declared that he did "not read the Court's opinion to say anything inconsistent with or different than the preceding discussion" and reiterated that his "disagreement with the Court concern[ed] the application of these principles to the facts" of the Celotex case. Id. at 334.

### 3. *Byrd v. Hall*

Seven years after the Celotex trilogy, this Court set out in Byrd "to establish a clearer and more coherent summary judgment jurisprudence" under Tennessee Rule 56. 847 S.W.2d at 209. The Byrd Court stated, after examining prior Tennessee decisions and the Celotex trilogy, that "[c]omparison of the state and federal caselaw construing [Federal and Tennessee] Rule[s] 56 to date reveals no striking differences." Id. at 214. The Court observed that "[t]his similarity of construction is not remarkable since [Federal Rule] 56 served as the blueprint for our own [Tennessee] Rule 56, and the language of both rules is virtually identical." Id. The Byrd Court described Celotex as standing for the "principle that a party may move for summary judgment demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for directed verdict." 847 S.W.2d at 213. And, the Byrd Court noted that the Sixth Circuit had "read Celotex to mean that 'the movant [can] challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery . . . if the [nonmoving party does] not 'put up,' summary judgment [is] proper.'" Id. (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989) (alterations in original)). The Byrd Court then expressly "embrace[d] the construction of Rule 56 in Anderson, Celotex, and Matsushita [Electric Industrial Company] to the extent discussed in the prior section of this opinion relating to those cases." Byrd, 847 S.W.2d at 214.

Unfortunately, however, the Byrd Court followed up this pronouncement with several "observations" intended "to place a finer point on the proper use of the summary judgment process in this [S]tate." Id. As for the burdens of production placed on moving and nonmoving parties, the Court stated:

> [T]he party seeking summary judgment has the burden of demonstrating to the court that there are no disputed, material facts creating a genuine issue for trial, as we have defined those terms, and that he is entitled to judgment as a matter of law. A conclusory assertion that the nonmoving party has no

- 26 -

evidence is clearly insufficient. When the party seeking summary judgment makes a properly supported motion, the burden then shifts to the nonmoving party to set forth specific facts, not legal conclusions, by using affidavits or the discovery materials listed in Rule 56.03, establishing that there are indeed disputed, material facts creating a genuine issue that needs to be resolved by the trier of fact and that a trial is therefore necessary. The nonmoving party may not rely upon the allegations or denials of his pleadings in carrying out this burden as mandated by Rule 56.05. The evidence offered by the nonmoving party must be taken as true. Moreover, the facts on which the nonmovant relies must be admissible at the trial but need not be in admissible form as presented in the motion (otherwise an affidavit, for example, would be excluded as hearsay). To permit an opposition to be based on evidence that would not be admissible at trial would undermine the goal of the summary judgment process to prevent unnecessary trials since inadmissible evidence could not be used to support a jury verdict.

Byrd, 847 S.W.2d at 215-16 (footnotes omitted).

Although the Byrd Court stated that a moving party may satisfy "this required showing in several ways," it provided only two examples. Id. at 215 n.5. As the first example, the Byrd Court stated that a moving party may carry its burden by "affirmatively negat[ing] an essential element of the nonmoving party's claim." Id. As for the second example, the Court stated that "the moving party could conclusively establish an affirmative defense that defeats the nonmoving party's claim, i.e., a defendant would be entitled to summary judgment if he demonstrated that the nonmoving party cannot establish an essential element of his case." Id. (citing Celotex, 477 U.S. at 331 (Brennan, J., dissenting)). The Byrd Court also turned to Justice Brennan's Celotex dissent for examples of how a nonmoving party may satisfy its burden when faced with a properly supported motion for summary judgment, explaining that in such circumstances a nonmoving party may: (1) point to evidence overlooked or ignored by the moving party that establishes a material factual dispute; (2) rehabilitate evidence attacked in the moving party's papers; (3) produce additional evidence showing the existence of a genuine issue for trial; or (4) submit an affidavit explaining why further discovery is necessary as provided for in Tennessee Rule of Civil Procedure 56.06. Id. at 215 n.6.

### 4. *The Confusion Byrd Engendered*

Although Byrd "quickly became Tennessee's summary judgment bible," it also quickly "drew criticism" and spawned confusion. Andrée Sophia Blumstein, Bye, Bye Byrd?, 45 Tenn. B.J. 23, 23 (Feb. 2009); see also June F. Entman, Flawed Activism: The Tennessee Supreme Court's Advisory Opinions on Joint Tort Liability and Summary Judgment, 24 Mem. St. U. L. Rev. 193, 216 (1994) [hereinafter Flawed Activism]. One

commentator stated that although Byrd had "purport[ed] to adopt the federal standard for evaluating the movant's burden when the nonmovant bears the burden of proof on an issue, [Byrd] actually established a more rigorous standard for movants in Tennessee courts." Judy M. Cornett, The Legacy of Byrd v. Hall: Gossiping about Summary Judgment in Tennessee, 69 Tenn. L. Rev. 175, 175 (2001) [hereinafter Gossiping about Summary Judgment). The confusion centered on "whether the party seeking summary judgment must *itself affirmatively negate* an essential element of the nonmovant's claim or whether it can just point to the nonmovant's failure to have come forward with evidence supporting its claim." Bye, Bye Byrd?, 45 Tenn. B.J. at 23. Those on one side of the debate interpreted Byrd as following the Celotex trilogy and allowing a movant to satisfy its burden of production by demonstrating that the nonmovant's evidence was insufficient to establish an essential element of the nonmovant's claim. See Denton v. Hahn, No. M2003-00342-COA-R3-CV, 2004 WL 2083711, at *10-11 (Tenn. Ct. App. May 4, 2004) (Koch, J., majority opinion). This reading was based on the Byrd Court having embraced the interpretation of Federal Rule 56 in the Celotex trilogy and having quoted with apparent approval the Sixth Circuit's interpretation of Celotex. Andrée Sophia Blumstein, Bye Bye Hannan?, 47 Tenn. B.J. 14, 15 (Aug. 2011). Those on the other side of the debate read Byrd, particularly in light of subsequent summary judgment decisions of this Court,[5] as having adopted a standard dramatically different from the Celotex trilogy approach. See Denton, 2004 WL 2083711, at *14 (Tenn. Ct. App. May 4, 2004) (Cottrell, J., concurring); Gossiping about Summary Judgment, 69 Tenn. L. Rev. at 220 (stating that McCarley v. West Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998) "made real what was only incipient in Byrd: Tennessee's break with federal summary judgment jurisprudence"); Bye, Bye Byrd?, 45 Tenn. B.J. at 23. Under this interpretation of Byrd, a movant could not meet its burden simply by demonstrating that the nonmovant's evidence was insufficient at the summary judgment stage but was required to affirmatively negate an essential element of the nonmovant's claim or defense. Bye, Bye Byrd?, 45 Tenn. B.J. at 23. Additionally, the burden of production shifted to the nonmovant only if the movant satisfied this affirmative negation burden. Id. This reading of Byrd derived primarily from the fact that the Byrd Court discussed with approval the majority decision authored by Justice Rehnquist, as well as elements of Justice White's concurring opinion and Justice Brennan's dissenting opinion. Gossiping About Summary Judgment, 69 Tenn. L. Rev. at 180-93; Flawed Activism, 24 Mem. St. U. L. Rev. at 216-19. Proponents of this view pointed specifically to footnote five of Byrd, which provided the two examples from Justice Brennan's dissenting opinion of how a moving party may satisfy its burden of production. Bye Bye Hannan?, 47 Tenn. B.J. at 15.

---

[5] See Blair v. West Town Mall, 130 S.W.3d 761, 767 (Tenn. 2004); Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 88 (Tenn. 2000); McCarley v. West Quality Food Serv., 960 S.W.2d 585, 588 (Tenn. 1998).

## 5. *Hannan and its Aftermath*

We granted permission to appeal in Hannan to settle the debate and resolve the confusion about the proper interpretation of Byrd. Hannan, 270 S.W.3d at 1. After examining Byrd, McCarley, and other summary judgment decisions applying Byrd, the majority in Hannan, which included the undersigned, declared:

> *These cases clearly show that a moving party's burden of production in Tennessee differs from the federal burden.* It is not enough for the moving party to challenge the nonmoving party to "put up or shut up" or even to cast doubt on a party's ability to prove an element at trial.

> . . . .

> *In summary, in Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.*

> These are the two burden-shifting methods available to the moving party when the moving party does not bear the burden of proof at trial. The burden-shifting analysis differs, however, if the party bearing the burden at trial is the moving party. For example, a plaintiff who files a motion for partial summary judgment on an element of his or her claim shifts the burden by alleging undisputed facts that show the existence of that element and entitle the plaintiff to summary judgment as a matter of law. Similarly, a defendant asserting an affirmative defense, such as laches, shifts the burden of production by alleging undisputed facts that show the existence of the affirmative defense.

Id. at 8-9 & n.6 (emphasis added). Although the majority in Hannan acknowledged that no prior decision had explicitly rejected the Celotex standard, we explained that our "departure" from the federal standard actually began in Byrd and merely continued in McCarley and subsequent decisions. Hannan, 270 S.W.3d at 7 (citing Blair, 130 S.W.3d at 768; Staples, 15 S.W.3d at 88; McCarley, 960 S.W.2d at 588); see also Hannan, 270 S.W.3d at 7 n.4 (stating that at least one legal commentator had interpreted Byrd as departing from the Celotex standard and citing Gossiping about Summary Judgment in Tennessee, 69 Tenn. L. Rev. at 220). The Hannan majority did not, however, base its rejection of the Celotex standard on historical differences between federal and Tennessee summary judgment practice or textual differences between the state and federal versions of Rule 56. The Hannan majority also failed to acknowledge that only eight other states applied standards different from Celotex. Cornett's Summary Judgment in Tennessee, 77

Tenn. L. Rev. at 44 & nn. 266-273. Rather, the Hannan majority focused on settling the dispute over the proper interpretation of Byrd. See Cornett's Summary Judgment in Tennessee, 77 Tenn. L. Rev. at 337 ("The real tragedy of Hannan is . . . that it addressed only the issue of what Tennessee law is, not what it should be. By making Hannan an interpretive battle over Byrd, the parties lost the opportunity to argue why Celotex would be a preferable summary judgment standard for Tennessee." (footnote omitted)).

Justice William C. Koch, Jr. dissented in Hannan. Hannan, 270 S.W.3d at 11 (Koch, J., dissenting). Justice Koch emphasized that Tennessee Rule 56 was patterned upon, and remained essentially identical to, Federal Rule 56. Id. at 12. Justice Koch noted as well that in the years after its adoption, this Court had interpreted Tennessee Rule 56 in a manner that "mirrored the federal courts' application of [Federal Rule 56]." Id. at 12-13. Justice Koch disagreed that Byrd departed from the federal standard, and he quoted the language of Byrd that purported to "embrace" the Celotex trilogy—including the portion of Celotex which permitted a moving party to satisfy its burden of production by demonstrating that the nonmoving party's evidence is insufficient at the summary judgment stage to establish an essential element of the nonmoving party's claim or defense. Id. at 16 (citing Byrd, 847 S.W.2d at 213, 215 n.5). Justice Koch predicted that Hannan would ultimately "undermine, rather than enhance, the utility of summary judgment proceedings as opportunities to weed out frivolous lawsuits and to avoid the time and expense of unnecessary trials." Id. at 12.

Justice Koch was not alone in his view that Hannan had significantly altered Tennessee summary judgment practice. According to one author, "most commentators believed that Hannan ha[d] driven a stake through the heart of summary judgment in Tennessee," and "[t]he predominant reaction to Hannan by the trial bench and the bar" was "trepidation." Cornett's Summary Judgment in Tennessee, 77 Tenn. L. Rev. at 306. Another commentator noted that by including the words "at trial" in the second example of how a movant may satisfy its burden of production, Hannan had shifted the burden of production away from the party who would bear the burden of proof at trial and "saddled" the defendant "with the burden of proof, a burden that requires the defendant to prove the negative of plaintiff's claim." Bye, Bye Byrd?, 45 Tenn. B.J. at 26. However, others, including the undersigned, viewed Hannan as merely reaffirming the summary judgment standards that had been applied since Byrd. See Cornett's Summary Judgment in Tennessee, 77 Tenn. L. Rev. at 332 (stating that in Hannan the majority had "stuck to its guns and reaffirmed the Byrd-McCarley-Blair standard").

Two years later it became clear that others in the Hannan majority viewed it as having fundamentally changed summary judgment practice when this Court, in a three-to-two decision, abandoned the burden-shifting mechanics set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for use at the summary judgment stage of employment discrimination and retaliation cases, as incompatible with the Hannan summary judgment standard. Gossett v. Tractor Supply Co., Inc., 320 S.W.3d 777, 785

(Tenn. 2010); see also Kinsler v. Berkline, LLC, 320 S.W.3d 796, 801 (Tenn. 2010).[6] A year later, in 2011, the General Assembly enacted a statute "with the stated purpose 'to overrule the summary judgment standard for parties who do not bear the burden of proof at trial set forth in Hannan v. Alltel Publishing Co., its progeny, and the cases relied on in Hannan.'" Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 25 n.2 (Tenn. 2011) (quoting Act of May 20, 2011, ch. 498, § 2 Tenn. Pub. Acts 1471).[7]

## 6. Hannan Reconsidered

Having reexamined the Celotex trilogy, Byrd, and the majority and dissenting opinions in Hannan, as well as the cases that have followed it, we conclude that the standard adopted in Hannan is incompatible with the history and text of Tennessee Rule 56 and has functioned in practice to frustrate the purposes for which summary judgment was intended—a rapid and inexpensive means of resolving issues and cases about which there is no genuine issue regarding material facts. Bowman, 547 S.W.2d at 529; Evco Corp., 528 S.W.2d at 24. Whether the standard began with Byrd or originated in Hannan, we conclude that the standard has shifted the balance too far and imposed on parties seeking summary judgment an almost insurmountable burden of production, as the Court of Appeals' decision in this case illustrates. See also Boals v. Murphy, No. W2013-00310-COA-R3-CV, 2013 WL 5872225, at *15 (Tenn. Ct. App. Oct. 30, 2013) (Kirby, J., author) ("'Under Hannan, as we perceive the ruling in that case, it is not enough to rely on the nonmoving party's lack of proof even where, as here, the trial court entered a scheduling order and ruled on the summary judgment motion after the deadline for discovery had passed. Under Hannan, we are required to assume that the nonmoving

---

[6] The undersigned, joined by Justice Koch, dissented in Gossett and Kinsler from the majority's decisions to abandon the McDonnell Douglas framework and argued that it was not incompatible with Hannan. Gossett, 320 S.W.3d at 789 (Clark, J., dissenting in part and concurring in the judgment); Kinsler, 320 S.W.3d at 802 (Clark, J., concurring in part and concurring in the judgment).

[7] Tennessee Code Annotated section 20-16-101 provides as follows:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101 (Supp. 2014) (effective July 1, 2011). This statute does not apply in this appeal because the Ryes filed this action before the statute's July 1, 2011 effective date.

party may still, by the time of trial, somehow come up with evidence to support her claim.'" (quoting White v. Target Corp., No. W2010-02372-COA-R3-CV, 2012 WL 6599814, at *7 n.3 (Tenn. Ct. App. Dec. 18, 2012) (Kirby, J., author))).

Like Federal Rule 56, Tennessee Rule 56 does not require the moving party to present affidavits. Instead, it expressly dispenses with that requirement, stating that "a party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment" and "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought" may move for summary judgment "*with or without supporting affidavits*." Tenn. R. Civ. P. 56.01, 56.02 (emphasis added); see also Tenn. R. Civ. P. 56.04 (directing the court to consider "affidavits, *if any*," in determining whether summary judgment should be granted (emphasis added)). Tennessee Rule 56 *requires* both the movant and the nonmovant to submit statements of undisputed facts, supported by citations to the record, "[i]n order to assist the Court in ascertaining whether there are any material facts in dispute," Tenn. R. Civ. P. 56.03, and provides that, "[s]ubject to the moving party's compliance with Rule 56.03, the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, *if any*, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04 (emphasis added). Like Federal Rule 56, Tennessee Rule 56 clearly states that when a summary judgment motion is "supported as provided in [Tennessee Rule 56]," the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading," but in response, "by affidavits or as otherwise provided in [Tennessee Rule 56], must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Tenn. R. Civ. P. 56.06. Conspicuously absent from Tennessee Rule 56 is any language requiring the moving party to seek, obtain, and comply with a scheduling order before moving for summary judgment, although, according to the dissent, Hannan imposed this obligation.

Instead, like Federal Rule 56, Tennessee Rule 56 authorizes courts to order continuances on summary judgment motions to allow a party opposing summary judgment to obtain affidavits, take depositions, or engage in other forms of discovery as may be ordered. Tenn. R. Civ. P. 56.07. Because Tennessee Rule 56 provides trial courts with authority to grant continuances to nonmoving parties when summary judgment motions are made before adequate time for discovery has been provided, any differences between discovery in the federal system and discovery under the Tennessee Rules of Civil Procedure do not warrant rejection of the standards enunciated in the Celotex trilogy.

There is simply nothing in the history or text of Tennessee Rule 56 which necessitates rejecting the standards enunciated in the Celotex trilogy. Despite the dissent's assertions to the contrary, the principle in Tennessee law that cases should be

decided on the merits does not require rejection of the Celotex trilogy. When a court determines, consistent with the standards in Tennessee Rule 56, that no genuine issue of material fact exists and grants summary judgment, the case *has been decided on the merits*.[8] For the same reason, adoption of the standards enunciated in the Celotex trilogy is entirely consistent with the constitutional right to trial by jury guaranteed by article I, section 6 of the Tennessee Constitution. As one commentator has put it, "under common law, a fact issue was the sine qua non of trial." Cornett's Summary Judgment in Tennessee, 77 Tenn. L. Rev. at 311. Tennessee courts have "always been empowered to decide legal questions upon agreed facts." Id. Tennessee Rule 56 "simply embodies the common law's recognition that if there is no factual dispute, there is no need for trial." Id.

We are mindful that the power of this Court to overrule former decisions "is very sparingly exercised and only when the reason is compelling." Edingbourgh v. Sears, Roebuck & Co., 337 S.W.2d 13, 14 (Tenn. 1960). Adhering to prior decisions is generally "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827 (1991) (citing Vasquez v. Hillery, 474 U.S. 254, 265-66 (1986)); see also In re Estate of McFarland, 167 S.W.3d 299, 306 (Tenn. 2005). Simply stated, "'in most matters it is more important that the applicable rule of law be settled than it be settled right.'" Payne, 501 U.S. at 827 (quoting Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406 (1932)).

Nevertheless, "[o]ur oath is to do justice, not to perpetuate error." Jordan v. Baptist Three Rivers Hosp., 984 S.W.2d 593, 599 (Tenn. 1999) (quoting Montgomery v. Stephan, 101 N.W.2d 227, 229 (Mich. 1960)). As a result, we are not constrained to follow "unworkable" or "badly reasoned" precedent. Payne, 501 U.S. at 827 (citing Smith v. Allwright, 321 U.S. 649, 665 (1944); see also In re Estate of McFarland, 167 S.W.3d at 306 (stating that "obvious error or unreasonableness in the precedent, changes in conditions which render the precedent obsolete, the likelihood that adherence to precedence would cause greater harm to the community than would disregarding stare decisis, or an inconsistency between precedent and a constitutional provision" justify overturning well-settled rules of law). Thus, "if an error has been committed, and becomes plain and palpable, th[is] [C]ourt will not decline to correct it, even though it may have been reasserted and acquiesced in for a long number of years." Arnold v. City of Knoxville, 90 S.W. 469, 470 (Tenn. 1905); see, e.g., State v. Watkins, 362 S.W.3d 530, 556 (Tenn. 2012) (overruling a sixteen-year-old decision because the state constitutional test it adopted was unworkable and because there was no textual or

---

[8] Indeed, although the dissent views Hannan as the better standard, by forcing parties to proceed to trial even when no genuine issues of material fact exist at the summary judgment stage, the Hannan standard actually is antithetical to the principle favoring "the just, speedy, and inexpensive determination" of actions on the merits. Tenn. R. Civ. P. 1.

historical basis for interpreting the state constitutional provision as requiring a test distinct from the federal constitutional provision); Mercer v. Vanderbilt Univ., 134 S.W.3d 121, 129-30 (Tenn. 2004) (overruling an eight-year-old decision that had adopted a minority rule and adopting instead the "better-reasoned" majority rule); Jordan, 984 S.W.2d at 600 (abrogating a ninety-six-year-old decision even though the statutory language it had interpreted remained the same).[9]

Indeed, we have "a special duty" to correct erroneous rules that have been "recognized and nurtured" by this Court. Hanover v. Ruch, 809 S.W.2d 893, 896 (Tenn. 1991) (abolishing the common law tort of criminal conversation for all cases filed prior to the effective date of a statute prospectively abolishing it); see also Dupis v. Hand, 814 S.W.2d 340, 345 (Tenn. 1991) (abolishing the common law tort of alienation of affections for all cases filed prior to the effective date of a statute prospectively abolishing it). We would "abdicate our own function" were we to refuse to correct unworkable or erroneous court-made rules. Hanover, 809 S.W.2d at 896.[10]

---

[9] The Ryes' suggestion that any decision overruling Hannan and adopting the standards of the Celotex trilogy amounts to an impermissible retroactive application of Tennessee Code Annotated section 20-16-101, which violates article I, section 20 of the Tennessee Constitution, is simply incorrect. See Tenn. Cons. art. 1, § 20 ("[N]o retrospective law, or law impairing the obligations of contracts, shall be made."). That statute is irrelevant to this appeal. Thus, we are not retroactively applying the statute. Our decision overruling the manner in which Hannan interpreted Tennessee Rule 56 amounts instead to a proper exercise of our authority to reconsider, and when appropriate, abandon rules of law previously articulated in judicial decisions. In civil cases, judicial decisions overruling prior cases generally *are applied retrospectively*. Hill v. City of Germantown, 31 S.W.3d 234, 239 (Tenn. 2000).

[10] The dissent either overlooks our obligation to correct erroneous court-made rules or fundamentally misunderstands it. By abandoning the Hannan standard, we are not, as the dissent asserts, "surrendering the constitutional authority of this Supreme Court to establish summary judgment standards for the judiciary." To the contrary, we are accepting responsibility for creating an unworkable standard and exercising our constitutional authority to correct the error and establish a workable summary judgment standard. The dissent's disagreement with our decision to abandon Hannan is understandable, as the dissenting justice, like the undersigned, joined the majority decision in Hannan. However, the dissent's suggestions that our decision somehow compromises judicial independence and disregards the doctrine of separation of powers are unfathomable and lack legal or factual foundation. By our decision in this appeal we cannot preempt a constitutional challenge to a statute that does not apply in this appeal. Our determination that the Hannan standard is unworkable is independent of and unrelated to legislative action. Furthermore, the fact that our decision comes after the Legislature has already enacted a statute aimed at changing the Hannan standard is not at all unusual. See, e.g., Dupis, 814 S.W.2d at 345 (deciding to abolish a tort after it had already been prospectively abolished by the Legislature); Hanover, 809 S.W.2d at 896 (same). Indeed, over twenty years ago, we recognized that "it would be anomalous" for this Court to refuse to consider abolishing common law torts in cases arising before statutes were enacted prospectively abolishing those same common law torts, and we noted that "the Legislature may not constitutionally preclude such consideration." Hanover, 809 S.W.2d at 896. These observations apply with equal force to the resolution of this appeal. Despite the dissent's doubts, we do not take lightly our oaths to uphold the United States and Tennessee Constitutions and understand fully the function and importance of the doctrine of separation of powers. Nevertheless, nothing requires us to maintain an

Because the standard articulated in <u>Hannan</u> is unworkable and inconsistent with the history and text of Tennessee Rule 56, we take this opportunity to correct course, overrule <u>Hannan</u>, and fully embrace the standards articulated in the <u>Celotex</u> trilogy.[11]

## 7. Recap of Tennessee Summary Judgment Standards

Our overruling of <u>Hannan</u> means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." <u>Id.</u> When such a motion is made, any party opposing summary judgment party must file a response to each fact set forth by the nonmovant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary

_____

unworkable court-made rule simply because another branch of government has arguably invaded the province of the judiciary.

[11] We recognize that our decision to overrule <u>Hannan</u> calls into question the continued viability of <u>Gossett</u> and <u>Kinsler</u>, in which the majority rejected the <u>McDonnell Douglas</u> burden-shifting framework based on its incompatibility with <u>Hannan</u>. <u>See</u> <u>Williams v. City of Burns</u>, __ S.W.3d __, 2015 WL 2265531, at *11 n.15 (Tenn. May 4, 2015); <u>Sykes</u>, 343 S.W.3d at 26. Nevertheless, neither the continued viability of <u>Gossett</u> and <u>Kinsler</u>, nor the 2011 law amending Tennessee Code Annotated sections 4-21-311, 50-1-304, and 50-1-701 as to "causes of action accruing on or after" its effective date of June 10, 2011, are at issue in this interlocutory appeal. <u>See</u> Act of June 10, 2011, ch. 461, 2011 Tenn. Pub. Acts 1227. We decline to address these questions unless and until they are presented in an appropriate case.

judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial. We turn our attention next to applying these standards in this appeal.

## C. Application of Summary Judgment Standards

### 1. Future Medical Expenses Arising from Mrs. Rye's Rh-sensitization

The Defendants argue that they are entitled to summary judgment because, even assuming Mrs. Rye's Rh-sensitization is considered a presently existing physical injury, the undisputed facts demonstrate that Mrs. Rye has not sustained any damages related to this injury and that no such damages are reasonably certain to occur.[12] We agree.

To prevail on a health care liability claim, a plaintiff must establish the following statutory elements:

> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the

---

[12] The dissent mischaracterizes our holding as concluding that Rh-sensitization does not under any circumstances qualify as a compensable injury and asserts that, in so holding, we are out of step with "several federal and state courts," which have recognized the cause of action. Actually, we are assuming for purposes of this appeal that Rh-sensitization may qualify as a compensable injury so long as damages are proven to a reasonable certainty. Furthermore, the dissent's assertion that "several federal and state courts" have recognized the viability of such a cause of action is questionable, at best, given that the assertion is supported by citations to a single state supreme court decision and three federal district court decisions. Some of these decisions are also factually distinct from this case. For example, in the Arizona Supreme Court decision, the lawsuit was brought after the Rh-sensitized mother's second child had been stillborn as a result of her undiscovered Rh-sensitization. Kenyon v. Hammer, 688 P.2d 961, 963 (Ariz. 1984). One of the federal district court decisions involved beryllium sensitization, not Rh-sensitization. Harris v. Brush Wellman Inc., No. CIVA1:04CV598HSORHW, 2007 WL 5960181, at *12 (S.D. Miss. Oct. 30, 2007). Another of the cited federal district court decisions involved a woman who sued *the manufacturer* of RhoGAM, alleging that the dosage she received was defective and failed to prevent her Rh-sensitization. Alberg v. Ortho-Clinical Diagnostics, Inc., No. 98-CV-2006, 2000 WL 306701, at *1 (N.D.N.Y. Mar. 24, 2000). She alleged causes of action for negligence, *breach of warranty, and strict products liability*, claiming that her fear of becoming pregnant after learning of her Rh-sensitization had caused emotional injuries. She produced enough evidence of emotional injury to survive summary judgment on these claims. Id. at *3. In Harms v. Lab. Corp. of Am., 155 F. Supp. 2d 891, 912 (N.D. Ill. 2001), the case most factually similar to this one, the court limited the Rh-sensitized woman's recovery "only to those injuries for which [the woman] herself [was] at risk" and disallowed recovery for the "risk of future injury to any future fetus," on the ground that "it is impossible to determine without speculation what sort of injury—if any—the fetus would suffer." Id. Therefore Harms is not inconsistent with our holding in this appeal.

community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (2012). A legal injury "signifies an act or omission against [a] person's rights that results in some damage." Church v. Perales, 39 S.W.3d 149, 171 (Tenn. Ct. App. 2000) (citing Barnes v. Kyle, 306 S.W.2d 1, 4 (Tenn. 1957)). "Any want of skillful care or diligence on a physician's part that sets back a patient's recovery, prolongs the patient's illness, increases the plaintiff's suffering, or, in short, makes the patient's condition worse than if due skill, care, and diligence had been used, constitutes injury for the purpose of a [health care liability action]." Church, 39 S.W.3d at 171.

In this case, the defense expert, Dr. Stovall, testified "within a reasonable degree of medical certainty that, while Mrs. Rye [has become] Rh-sensitized, she has incurred no physical injuries." The Ryes' expert, Dr. Bruner, stated that, "[b]iologically, [Mrs. Rye] is not the same person she was before she became Rh-sensitized" and "now possesses diseased blood" for life because of the Defendants' negligence. The facts are undisputed that Mrs. Rye's blood now contains antibodies that it would not have contained but for the Defendants' negligence.

Although the experts disagree as to whether the undisputed facts amount to a physical injury, this difference of opinion is not material. As noted above, a legal injury "signifies an act or omission against [a] person's rights that results in some damage." Church, 39 S.W.3d at 171. Thus, even assuming Mrs. Rye's Rh-sensitization amounts to a physical injury, the dispositive question is whether genuine issues of material fact exist as to the third factor: whether Mrs. Rye is reasonably certain to sustain damages for future medical expenses as a result of her Rh-sensitization.[13]

After careful review, we answer this question in the negative. "The *existence* of damages cannot be uncertain, speculative, or remote." Discover Bank v. Morgan, 363 S.W.3d 479, 496 (Tenn. 2012). "Damages may never be based on mere conjecture or speculation." Overstreet v. Shoney's Inc., 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999).

---

[13] The Ryes did not request damages for past medical expenses in their complaint, although the memorandum of law the Ryes filed in the trial court mentioned that Mrs. Rye had been billed $343.00 for a medical evaluation/consultation with Dr. Michael Schneider. According to the Ryes' deposition testimony, Dr. Schneider met with them after Mrs. Rye's Rh-sensitization was discovered and explained the risks it posed for future pregnancies.

"[T]o recover for [the] future effects of an injury, the future effects must be shown to be reasonably certain and not a mere likelihood or possibility and . . . there must be a reasonable degree of medical certainty that the plaintiff will develop a disease in the future as a result of an injury." Potts v. Celotex Corp., 796 S.W.2d 678, 681 (Tenn. 1990). As the Court of Appeals has more recently explained:

> A person who is injured by another's negligence may recover damages from the other person for all past, present, and prospective harm. Included in the prospective harm for which damages may be recovered is the reasonable cost of the medical services that will probably be incurred because of the lingering effects of the injuries caused by the negligent person. To remove awards for future medical expenses from the realm of speculation, persons seeking future medical expenses must present evidence (1) [showing] that additional medical treatment is reasonably certain to be required in the future and (2) [enabling] the trier-of-fact to reasonably estimate the cost of the expected treatment.

> The first component of a claim for future medical expenses is, in the language of the Tennessee Pattern Jury Instructions, evidence that additional medical treatment is "reasonably certain to be required in the future." This "reasonable certainty" standard requires more than a mere likelihood or possibility. It requires the plaintiff to establish with some degree of certainty that he or she will undergo future medical treatment for the injuries caused by the defendant's negligence. It does not, however, require proof of future medical treatment to an absolute or metaphysical certainty. Rather, the "reasonable certainty" standard requires the plaintiff to prove that he or she will, more probably than not, need these medical services in the future.

Singh v. Larry Fowler Trucking, Inc., 390 S.W.3d 280, 287-88 (Tenn. Ct. App. 2012) (quoting Henley v. Amacher, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *13-14 (Tenn. Ct. App. Jan. 28, 2002)); see also 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 14.50 (2014 ed.) ("If you are to determine a party's damages, you must compensate that party for loss or harm that is reasonably certain to be suffered in the future as a result of the injury in question. You may not include speculative damages, which is compensation for future loss or harm that, although possible, is conjectural or not reasonably certain.")

In his affidavit, Dr. Stovall opined that any future risks to Mrs. Rye as a result of a future pregnancy are "extremely remote" and that "it cannot be said with any reasonable degree of medical certainty that an Rh-sensitized patient will ever sustain any injuries or damages." In his deposition, Dr. Stovall reiterated his opinion that, unless Mrs. Rye becomes pregnant again, the Rh-sensitization presents no risk at all to her. Even if Mrs. Rye becomes pregnant in the future with an Rh-positive child, Dr. Stovall opined that

- 38 -

there is only a 40% chance "she will develop enough antibodies that those antibodies will cross the placenta and cause the baby to have or to require the baby to have additional monitoring." Even if additional monitoring is required, however, Dr. Stovall opined that it is "more likely than not, like overwhelmingly—overwhelmingly, more likely than not, [that Mrs. Rye] would not have any complications."

Dr. Bruner opined that Mrs. Rye will, more likely than not, become pregnant again because the Ryes have declined to use birth control and because Mrs. Rye had previously become pregnant three times. Dr. Bruner further testified that should Mrs. Rye become pregnant in the future, there is a 70% chance the fetus will be Rh positive. Dr. Bruner additionally opined that an Rh positive fetus would, more likely than not, suffer moderate to severe complications due to Mrs. Rye's above-average Rh sensitization. Dr. Bruner also opined that, under such circumstances, the child would require aggressive treatment, and if left untreated, the child could suffer moderate to severe complications. According to Dr. Bruner, were Mrs. Rye's future unborn fetus to experience complications as a result of her Rh-sensitization, these complications, as well as the monitoring and treatment of them, would increase Mrs. Rye's health risks and the health risks to the unborn fetus.

Dr. Bruner also opined that Mrs. Rye will suffer future medical expenses and damages from her Rh-sensitization should she be involved in a future medical emergency involving an acute blood loss that requires an emergent blood transfusion. According to Dr. Bruner, these damages will be incurred because "[t]he presence of Rh antibodies in Mrs. Rye's blood will double or even triple the time necessary to identify compatible units of blood for transfusions" and "[t]his time difference is likely to be life threatening in an emergency situation in which blood transfusions are required."

Having reviewed the record, including the motion, response, affidavits and depositions, under the applicable summary judgment standards, we agree with the trial court that the Defendants are entitled to summary judgment on Mrs. Rye's claim for future medical expenses associated with future pregnancies and future blood transfusions. Mrs. Ryes' evidence is insufficient as a matter of law to demonstrate that future medical expenses are reasonably certain to occur and demonstrates instead that future medical expenses depend entirely upon contingencies that have not occurred and may never occur.

Although Dr. Bruner opined that Mrs. Rye is more likely than not to become pregnant again, his testimony referred only to Mrs. Rye's deposition testimony that she and Mr. Rye had engaged in unprotected sex since her Rh-sensitization and his understanding that Mrs. Rye had become pregnant three times before when the couple had engaged in sexual relations without using birth control. Mrs. Rye's deposition testimony actually includes a great deal of additional information that Dr. Bruner did not mention. Specifically, Mrs. Rye testified that prior to her Rh-sensitization the couple had

not only declined to use birth control measures while engaging in unprotected sexual relations, they had planned to conceive children by determining when Mrs. Rye was "ovulating, things like that" and engaging in sexual relations during those times. Mrs. Rye stated that this planning had "worked" for them in conceiving children. After her Rh-sensitization, Mrs. Rye stated that the couple had used these same measures, along with the "rhythm" method, to prevent a fourth pregnancy. Mrs. Rye stated that the couple had abstained from sexual relations during times when Mrs. Rye "could be ovulating" and the likelihood of conception would have been greater. She also stated that the couple had "bought a bunch of tests" to assist them in determining when ovulation had occurred.[14] Mrs. Rye, then thirty-nine-years-old, testified that she had not become pregnant during the four years between her January 2008 Rh-sensitization and her April 12, 2012 deposition.

Moreover, even if the first contingency occurs and Mrs. Rye becomes pregnant in the future, the medical experts agree that neither Mrs. Rye nor her unborn child will suffer any risks at all from her Rh-sensitization unless the unborn future child's blood is Rh positive. Thus, the undisputed facts establish that two contingencies must occur before Mrs. Rye's Rh-sensitization poses even a *risk* of damages to either Mrs. Rye or her future unborn children. The undisputed facts are thus insufficient to establish a genuine issue of material fact for trial as to the reasonable certainty of future medical expenses associated with future pregnancies.[15]

Mrs. Rye's proof also falls short of establishing a genuine issue of material fact for trial with regard to the reasonable certainty of damages for future medical expenses associated with future blood transfusions. At least three contingencies must occur before Mrs. Rye will ever incur damages of this sort. First, she must experience a future medical emergency involving an acute blood loss. Second, the medical emergency must have created an immediate need for a blood transfusion. Third, the blood typing required as a result of Mrs. Rye's Rh-sensitization must have caused delay that prevented Mrs. Rye from immediately receiving the needed blood transfusion. The Ryes have offered no proof at all that any of these future contingencies will ever occur. Thus, the Ryes' request for future medical expenses arising from blood transfusions is based on possibilities and speculation, not reasonable certainty.

---

[14] Mrs. Rye also testified that she had previously used birth control pills to treat certain medical conditions, although she had not done so since her Rh-sensitization, and she also stated that the couple had used condoms previously for sanitary purposes and had done so within the year preceding her deposition.

[15] We have not weighed the evidence, as the dissent contends. Rather, we have considered *all* of the undisputed facts in the record, unlike the dissent, which has harvested from the record only those facts supporting its favored result.

The record taken as a whole could not lead a rational trier of fact to find that the Ryes are reasonably certain to incur future medical expenses associated with Mrs. Rye's future pregnancies or blood transfusions. Thus, there is no genuine issue for trial. Matsushita Elec. Indus. Co., 475 U.S. at 587. Because the Defendants have demonstrated, *after adequate time for discovery*, that Mrs. Rye lacks proof of an essential element of her claim and Mrs. Rye's response fails to identify proof supporting her claim, the Defendants are entitled to summary judgment. Accordingly, we reverse the Court of Appeals and reinstate the trial court's judgment granting the Defendants' summary judgment on Mrs. Rye's requests for damages for future medical expenses associated with future pregnancies and future potential blood transfusions.

## 2. *The Ryes' NIED Claims*

In Camper v. Minor, 915 S.W.2d 437 (Tenn. 1996), this Court held that a plaintiff who asserts an NIED claim need not prove an accompanying physical injury. Id. at 446. Instead, we held that such claims should be analyzed under a "general negligence approach." Id. However, the Camper Court imposed safeguards designed not only to compensate persons who sustain serious emotional injuries but also to avoid compensating trivial and non-meritorious claims. Id. To these ends, a plaintiff bringing a stand-alone NIED claim must prove that the emotional injury caused by the defendant's negligent conduct is "serious" or "severe." Id. And, "the claimed injury or impairment must be supported by expert medical or scientific proof." Id. Thus, Camper established that a plaintiff who brings a stand-alone NIED claim must (1) satisfy the five elements of ordinary negligence (duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause), (2) establish a "serious" or "severe" emotional injury, and (3) prove that the emotional injury is serious or severe with expert medical or scientific proof. Camper, 915 S.W.2d at 446; see also Rogers v. Louisville Land Co., 367 S.W.3d 196, 206 (Tenn. 2012).

In Estate of Amos v. Vanderbilt Univ., 62 S.W.3d 133, 134 (Tenn. 2001), this Court considered whether the Camper requirement of expert medical or scientific evidence of a serious or severe injury extends to all negligence claims resulting in emotional injury. The Estate of Amos Court held that the Camper requirement applies only to stand-alone NIED claims and does not apply to cases in which the alleged emotional injury is "parasitic" to other types of claims or injuries. Id. at 137. The Court explained:

> The special proof requirements in Camper are a unique safeguard to ensure the reliability of "stand-alone" negligent infliction of emotional distress claims. The subjective nature of "stand-alone" emotional injuries creates a risk for fraudulent claims. The risk of a fraudulent claim is less, however, in a case in which a claim for emotional injury damages is one of multiple claims for damages. When emotional damages are a "parasitic"

consequence of negligent conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements that apply to "stand-alone" emotional distress claims.

Id. at 136-37.

More recently, in Rogers, this Court reaffirmed that the "expert proof" requirement applies only to "stand-alone" NIED claims and does not apply when a plaintiff's emotional injuries are "a 'parasitic' consequence of negligent conduct that results in multiple types of damages." Rogers, 367 S.W.3d at 206 n. 10. Nevertheless, we also stated that actions for "negligent infliction of emotional distress (including all three "subspecies" of negligent infliction: 'stand-alone,' 'parasitic,' and 'bystander') require an identical element: *a showing that the plaintiff suffered a serious mental injury resulting from the defendant's conduct.*" Rogers, 367 S.W.3d at 206 (emphasis added). A serious or severe mental injury occurs, we stated, if the plaintiff shows that "a reasonable person, normally constituted, would [have been] unable to adequately cope with the mental stress engendered by the circumstances of the case." Id. at 210. We explained that "[u]nable to cope with the mental stress engendered" requires a plaintiff to demonstrate, by way of six enumerated, non-exclusive factors or by other pertinent evidence, "that he or she has suffered significant impairment in his or her daily life." Id. The "nonexclusive factors" Rogers enumerated are as follows:

(1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

(2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

(3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, [evidence of] the extreme and outrageous character of the defendant's conduct . . . .

Rogers, 367 S.W.3d at 209-10. Having summarized the governing legal principles, we must evaluate whether genuine issues of material fact exist as to the Ryes' emotional distress claims.[16]

We agree with the courts below that the undisputed facts establish that Mr. Rye has not suffered any physical injury. Although Mr. Rye argues that he has sustained an actual injury in the nature of a disruption of his family planning, we conclude, as will be explained more fully hereinafter, that Tennessee law does not recognize disruption of family planning as either an independent cause of action or an element of damages. Accordingly, Mr. Rye has alleged only a stand-alone NIED claim. We agree with the Defendants that summary judgment is appropriate because, despite having adequate time for discovery, and indeed despite expiration of all discovery deadlines, Mr. Rye has failed to submit any expert proof to establish a severe emotional injury—an essential element of his stand-alone NIED claim. Having demonstrated that Mr. Rye lacks proof of an essential element of his claim, the Defendants are entitled to summary judgment on this claim. Thus, we reverse the Court of Appeals' decision and reinstate the judgment of the trial court granting summary judgment on this issue.

We agree with the courts below that Mrs. Rye's claim for emotional distress damages is "parasitic" to her health care liability claim. However, we agree with the Defendants that summary judgment on this claim is appropriate because, although expert proof is not required, Mrs. Rye has offered no proof at all to demonstrate that she has suffered a severe or serious mental injury. Mrs. Rye testified in her deposition that she was "scared" and "so upset" when told of the risks her Rh-sensitization could pose to any future pregnancy, that she remains "very concerned" about the risks that could arise should she need a blood transfusion or become pregnant in the future. Mrs. Rye testified that she thinks about the risks associated with her Rh-sensitization "every day" and that she is more careful in her sexual relations with her husband because of the risks that could arise should she become pregnant in the future. However, Mrs. Rye stated that she has not sought emotional or psychiatric counseling or mental health treatment from a psychiatrist, a psychologist, a counselor, or anyone else as a result of her concerns. Mrs. Rye also testified that her concerns have not caused her to lose any time from work or business activities and that she has continued her parenting responsibilities without disruption.

Although we are not without sympathy for Mrs. Rye, considering the legal standards articulated in Rogers, we conclude that Mrs. Rye's testimony is clearly

---

[16] The dissent's conclusion that a genuine issue of material fact exists is flawed because the dissent fails to apply correctly the factors articulated in Rogers.

insufficient to create a genuine issue of material fact concerning the essential element of severe or serious mental injury. Despite adequate time for discovery, Mrs. Rye provided no evidence of a serious mental injury resulting from the Defendants' conduct. She has neither suffered physiological or psychological symptoms, nor sought medical or professional treatment, nor incurred any significant impairment in her daily functioning resulting from her Rh-sensitization. In fact, she testified that she has not sought any counseling or treatment of any sort and that her daily work and parenting routines have not been disrupted. Having demonstrated that Mrs. Rye's evidence is insufficient to create a genuine issue of material fact for trial, the Defendants are entitled to summary judgment on Mrs. Rye's parasitic claim for emotional distress damages.

### *3. The Ryes' Claims for Disruption of Family Planning*

The Ryes argue that the courts below erred in granting summary judgment on their claims for disruption of family planning. The Ryes assert that this Court should hold, based on Davis v. Davis, 842 S.W.2d 588, 600-601 (Tenn. 1992), that Tennessee law recognizes disruption of family planning as either an independent cause of action or as an element of damages for other negligence based claims. We agree with the Defendants that neither Davis nor any other Tennessee decision recognizes disruption of family planning as an independent cause of action or an element of damages.

Indeed, Davis is entirely distinguishable on its facts from this case. Davis began as a divorce action. Davis, 842 S.W.2d at 589. The divorcing couple could not agree as to the disposition of the cryogenically preserved product of their in vitro fertilization, which the Davis Court referred to as "frozen embryos." Id. Mrs. Davis originally sought custody of the frozen embryos and expressed her intent to use them to become pregnant once the divorce was final, but Mr. Davis objected to becoming a parent after the divorce and without his consent. Id. The trial court determined that the frozen embryos were "human beings" and awarded Mrs. Davis custody of them. Id. The Court of Appeals reversed and remanded to the trial court for entry of an order vesting Mr. and Mrs. Davis with "joint control . . . and equal voice over their disposition." Id. This Court granted review, adopted a balancing test to determine which potential parent should receive control of the frozen embryos, and after applying the balancing test, affirmed the Court of Appeals. Id. at 590, 598-602.

It is true that, in devising the balancing test, the Davis Court referenced decisions of the United States Supreme Court discussing (1) the individual constitutional right to "be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"; (2) procreational autonomy; (3) and parental rights and responsibilities regarding children. Id. at 598-602. However, the Davis Court neither held, nor implied, nor even suggested that Tennessee law recognizes disruption of family planning as either an independent action or an element of damages in negligence cases. Accordingly, we affirm the decisions of the

- 44 -

courts below granting the Defendants summary judgment on the Ryes' claim for disruption of family planning as an independent action. Having already concluded, on a separate basis, that summary judgment is appropriate on Mrs. Rye's parasitic claim for emotional distress damages, we need not address the trial court's ruling allowing Mrs. Rye to present evidence of disruption of the Ryes' family planning as proof of her parasitic emotional distress damages claim. As we have already concluded, however, Davis provides no support for the trial court's ruling.

## IV. Conclusion

Having overruled Hannan and adopted and applied the summary judgment standards articulated in the Celotex trilogy and in Tennessee Rule 56, we conclude that the Defendants are entitled to summary judgment on all claims the Ryes raised in this appeal. Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand this case to the trial court for entry of summary judgment on these claims and any further necessary proceedings consistent with this decision. Costs of this appeal are taxed to the Ryes, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE