
IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 17, 2017 Session[1]

**SAMUEL L. GRAHAM, JR., ET AL. v.
THE FAMILY CANCER CENTER PLLC, ET AL.**

**Appeal from the Circuit Court for Shelby County
No. CT-004144-14     Donna M. Fields, Judge**

---

**No. W2016-00859-COA-R3-CV**

---

This is a medical malpractice action.[2]   The plaintiffs timely filed suit against the defendants concerning the failure to timely diagnose the husband's prostate cancer.  After voluntarily dismissing the initial suit, the plaintiffs provided pre-suit notice before filing a second suit pursuant to the saving statute.  The defendants moved for summary judgment, arguing that the plaintiffs lacked sufficient expert testimony to establish their claim.  The court agreed and granted summary judgment.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Bill M. Wade, Memphis, Tennessee, for the appellants, Samuel L. Graham, Jr. and Velma Graham.

Katherine M. Anderson, W. Bradley Gilmer, and Hugh Francis, Memphis, Tennessee, for the appellees, the Family Cancer Center, PLLC and Earle Weeks, M.D.

---

[1] Counsel for the appellants waived oral argument; however, counsel for the appellees presented oral argument.

[2] Tennessee Code Annotated section 29-26-101 now defines most all cases occurring in a medical context as "health care liability actions."  The statute specifies that such an action "means any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability, on which the action is based. . . ."  Acts 2011, ch. 510, § 8. Effective April 23, 2012, the term "health care liability" replaced "medical malpractice" in the Code. Acts 2012, ch. 798.  The provisions of the revised statute do not apply to this action because the injuries at issue here accrued before October 1, 2011.

## OPINION

## I.    BACKGROUND

The pertinent facts of this case are not in dispute. In the 1990s, Samuel L. Graham, Jr. received treatment for non-Hodgkin's lymphoma from Earle Weeks, M.D. Mr. Graham returned periodically for continued monitoring after the initial treatment was successful. Throughout the years, Dr. Weeks measured Mr. Graham's prostate specific antigen ("PSA"). Mr. Graham's PSA rose from 2.0 ng/mL in 2000 to 4.8 ng/mL in December 2002 and to 8.5 ng/mL in April 2005. Additionally, Mr. Graham complained of dizziness and hematuria[3] in April 2002, hematuria in July 2004, and lower abdominal pain in April 2005, prompting Dr. Weeks to order an ultrasound. The ultrasound revealed findings consistent with "benign prostate hypotrophy." Dr. Weeks referred Mr. Graham to an urologist but took no further action.

Mr. Graham returned to Dr. Weeks for six follow-up visits from November 2005 to August 2007, when his PSA was measured at 12.0 ng/mL. Dr. Weeks never inquired whether Mr. Graham had met with an urologist and did not make an additional referral.

Approximately six months later, in February 2008, Mr. Graham presented to Lynn Conrad, M.D. again complaining of hematuria. His PSA was then measured at 26.660 ng/mL. Dr. Conrad ordered further testing and a biopsy, which revealed adenocarcinoma with a Gleason score of 7 (4 + 3).[4] On April 25, 2008, Mr. Graham received a radical prostatectomy.[5] Pathology revealed an "extensive adenocarcinoma of the prostate with a Gleason score of 9 (5 + 4)" and that the disease was "locally advanced" with "several high risk features including seminal vesicles involvement, lymphovascular involvement, and several positive margins." Mr. Graham was considered "at high risk for a local recurrence and distant metastatic disease."

---

[3] Hematuria is defined as "[t]he presence of blood or blood cells in the urine." Merriam-Webster Online Dictionary (2017) (www.merriamwebster.com (derived from Merriam-Webster's Collegiate Dictionary 11th ed.)).

[4] Gleason score is defined as "a score that is the sum of the two Gleason grades assigned to a prostate tumor and that is based on a scale of 2 to 10 with the lowest numbers indicating a slow-growing tumor unlikely to spread and the highest numbers indicating an aggressive tumor." Merriam-Webster Online Dictionary (2017) (www.merriamwebster.com (derived from Merriam-Webster's Collegiate Dictionary 11th ed.)).

[5] Prostatectomy is defined as the "surgical removal or resection of the prostate gland." Merriam-Webster Online Dictionary (2017) (www.merriamwebster.com (derived from Merriam-Webster's Collegiate Dictionary 11th ed.)).

On January 9, 2009, Mr. Graham and his wife, Velma Graham (collectively "Plaintiffs"), filed suit against Dr. Weeks and the Family Cancer Center, PLLC (collectively "Defendants").[6] They alleged that Defendants' failure to timely diagnose Mr. Graham's condition caused further injury and a less favorable outcome. As pertinent to this appeal, Plaintiffs alleged that Defendants failed to perform a prostate biopsy when Mr. Graham's PSA level rose to 4.8 ng/ML in 2002. Plaintiffs further alleged that Dr. Weeks was negligent from November 2005 through August 2007 by not following up with him about his PSA scores or referring him to an urologist.

Discovery ensued. Plaintiffs identified Philip Rast, M.D. and Stephan Allen, M.D. as expert witnesses. These witnesses were deposed. Defendants filed a motion in limine to exclude expert testimony or opinions regarding any negligence that occurred prior to January 9, 2006, pursuant to the applicable statute of repose. The court granted the motion. Further, the parties entered into a consent order prohibiting Dr. Rast or any expert witness other than Dr. Allen from offering opinions relating to Dr. Weeks's care of Mr. Graham. The agreement was reached based upon the following exchange during Dr. Rast's deposition in August 2012:

> Defense: Would you agree with me that the affidavit that you signed in 2010, and the only document that gives me your opinions does not mention any deviation from the recognized acceptable standard of professional practice from Dr. Weeks?
>
> Dr. Rast: That is correct.
>
> Defense: Yet today you said that you had an opinion about Dr. Weeks?
>
> Dr. Rast: That is correct.
>
> Defense: And now when did you form that opinion?
>
> Dr. Rast: Probably after going back over Dr. Week's records.
>
> Defense: Was it today or yesterday in the last week?
>
> Dr. Rast: I have not actually thought about this case for two years, so it has probably been within the last week or so.

---

[6] Plaintiffs also initially filed suit against Dr. Conrad and the Conrad/Pearson Clinic, PC. These parties were not included in the re-filed suit.

Defense: I will object to him expressing any opinions as to Dr. Weeks given that I was given absolutely no notice of an opinion and no way to prepare for him to express an opinion, and we will have to come back and depose him at your expense, Mr. Wade, if indeed he is going to express an opinion --

Plaintiff: How harsh.

Defense: -- since you failed to give me notice.

Plaintiff: How about I'm not going to offer to express any opinions of Dr. Weeks at trial. That is what Dr. [Allen] will be doing when we depose him on Friday, so if that is the case then we won't need to go further.

Defense: Then if that is the case, we have no other questions if he is not going to express any opinion to Dr. Weeks's care at trial.

Plaintiff: He won't be offered to.

Defense: I have nothing else to ask you.

Accordingly, Plaintiffs' expert proof was limited to the testimony and opinions offered by Dr. Allen during his deposition in August 2012.

As pertinent to this appeal, Dr. Allen testified as follows:

Question: Okay. The next paragraph is what I've labeled your second opinion. It's your opinion to a reasonable degree of medical certainty – and what does that term mean, reasonable degree of medical certainty?

Answer: The best I can do basically.

Question: Okay. - - that [Dr. Weeks] acted with less than or failed to act with ordinary and reasonable care in accordance with such standard by failing to take appropriate steps to accomplish diction prostate cancer at an early stage. Now did you write that?

* * *

Answer: Diction is a - - I mean I don't know what that means.

- 4 -

Question:     Yes, I don't either.  So can you explain this opinion to me?

Answer:     I think what I mean to say is accomplish a diagnosis.  But that's kind of an awkward way of saying it but I wrote it.

Question:     What was the specific time period you're talking about here?

Answer:     Well, I think they had many potential opportunities in 2004, 2005, 2006, 2007, up 'till he was eventually diagnosed in 2008.

Question:     So at no time during the treatment of this patient did they diagnose him, is that what you're saying?

Answer:     Right.

* * *

Question:     If the surgery had been done [when the PSA was measured at 12.0 ng/mL in August 2007], do you have an opinion about whether there would have been a different result?

Answer:     It probably would have been better than he had.  How much better, hard to say.  It was still a riskier cancer because it was, you know, higher than it had been before.  But we don't have that many points on the curve if you will.  But certainly there seemed to be some, you know, more aggressivity toward the end just prior to his diagnosis.  So.  Hard to say.

Question:     Would you agree that it would be more likely than not that the same treatment would have been offered if this patient had had the surgery when that PSA was checked and it was 12?

Answer:     I would say that my guess would - - I would lean towards saying that he probably would have had a slightly lower stage, pathological stage, and may not have had positive margins, might not have needed radiation.  But I can't say.

Question:     You can't say to a reasonable degree of medical certainty that - -

Answer:     No.

Question:       -- this would have made any difference - -

Answer:       Not in '07.

Question:       Okay. Well, that's what I was asking about is when that PSA was checked and it was 12?

Answer:       Yes, so that was just six months before when it really shot up like you say.

The case proceeded to trial. During the examination of Dr. Allen, defense counsel objected to any testimony not previously offered in the discovery deposition concerning a breach of the applicable standard of care from 2006 through 2008. Plaintiffs' counsel agreed that Dr. Allen testified by deposition concerning negligence that occurred in 2004 and 2005 but that his opinion was never limited to that timeframe. Counsel explained that the *continued* failure from 2006 through 2008 to ensure that Mr. Graham received proper treatment from an urologist violated the applicable standard of care. Before the court issued a ruling on the issue, Plaintiffs' counsel announced its desire to take a voluntary nonsuit on April 3, 2014.

Plaintiffs refiled their complaint on September 30, 2014. Again, the court excluded any testimony concerning acts of negligence prior to January 2006 in accordance with the statute of repose. In response to Defendants' request for the identification of expert witnesses, Plaintiffs again identified Drs. Allen and Rast and claimed that their prior depositions held the opinions each would offer at trial.

Thereafter, Defendants moved for summary judgment, arguing that Plaintiffs lacked sufficient expert testimony to establish their claim pursuant to Tennessee Code Annotated section 29-26-115. Defendants asserted as follows:

1.      The statute of repose limits the Plaintiffs' experts from expressing any opinion that any deviation from the standard of care occurred prior to three years before suit was filed – January 9, 2006;

2.      The Plaintiffs' only expert, [Dr. Allen], has expressed no opinion that Dr. Weeks deviated from the standard of care after January 9, 2006;

3.      Dr. Allen has no opinion that there was a standard of care violation after January 9, 2006 that, to a reasonable degree of medical certainty, or more likely than not caused any harm to Mr. Graham that would not have otherwise occurred; and

4.     Plaintiffs have represented . . . that they have identified all experts who will be called to testify at the trial of this cause and that such experts will testify as they did in the first lawsuit.

Plaintiffs responded by asserting that they presented sufficient expert testimony to establish their claim through Dr. Allen.

Citing the consent order from the first lawsuit, Defendants also filed a motion in limine to prohibit any attempt to elicit expert opinions from witnesses other than Dr. Allen. Following a hearing on the summary judgment motion, the court found that Dr. Allen "did not sufficiently testify that . . . [Dr. Weeks] more likely than not caused or contributed any injury to [Plaintiffs] that would not have otherwise occurred." The court explained that Dr. Allen did not offer an opinion to a reasonable degree of medical certainty but instead stated that it was "hard to say" whether the outcome would have been different and that he would "lean towards saying" that Mr. Graham's results could have been better. The court further held that Dr. Rast was prohibited from testifying in light of the prior consent order and Plaintiffs' failure to disclose any additional causation opinions made by Dr. Rast. Accordingly, the court granted summary judgment and dismissed the suit with prejudice. This timely appeal followed.

## II.     ISSUE

We consolidate the issues raised into the following single and dispositive issue: Whether the trial court erred in granting summary judgment.

## III.     STANDARD OF REVIEW

The appropriate summary judgment standard to be applied is as follows:

[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). When a properly supported motion is made, "the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in [Rule 56 of the Tennessee Rules of Civil Procedure], set

forth specific facts' at the summary judgment stage 'showing that there is a genuine issue for trial.'" *Id.* at 265 (quoting Tenn. R. Civ. P. 56.06). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

"We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness." *Rye*, 477 S.W.3d at 250 (citations omitted). "In doing so, we make a fresh determination of whether the requirements of [Rule 56] have been satisfied." *Id.* (citations omitted). We must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008).

## IV.    DISCUSSION

Medical malpractice claims are a specialized type of negligence action. Such actions in this state are controlled by the medical malpractice statute, which provides as follows:

(a)    In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1)    The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2)    That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3)    As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a) (2012). The three elements listed in subsection (a) of the statute must be proven by the testimony of a qualified expert. *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006).

- 8 -

Here, the trial court found that Plaintiffs had not produced an expert witness who could testify regarding causation, i.e., expert medical testimony that Defendants' actions proximately caused Mr. Graham further injury within the time period applicable. Plaintiffs argue that this finding was in error and that Drs. Allen and Rast should have been permitted to testify as expert witnesses.

Plaintiffs claim that Dr. Allen provided sufficient causation testimony regarding the relevant time period. Defendants argue that Plaintiffs waived the issue by advising the court that Dr. Allen was not expected to offer causation testimony. The record supports Defendants' assertion. In the hearing on the motion for summary judgment, Plaintiffs repeatedly claimed that Dr. Allen was not expected to offer causation testimony but would only testify concerning the applicable standard of care. A party may not offer a new issue for the first time on appeal. *See Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) (citing *Campbell Cnty. Bd. of Educ. v. Brownlee–Kesterson, Inc.*, 677 S.W.2d 457, 466-67 (Tenn. Ct. App. 1984)). "The jurisprudential restriction against permitting parties to raise issues on appeal that were not first raised in the trial court is premised on the doctrine of waiver." *Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009) (citations omitted).

Regardless of any potential for waiver, the record reflects that Dr. Allen did not offer sufficient causation testimony *for the relevant time period*. While we agree with Plaintiffs that expert witnesses are not required to use "magic words" such as "reasonable degree of medical certainty" in providing causation testimony, Dr. Allen specifically stated that he could *not* testify that surgery in 2007 would have made a difference. Plaintiffs note in their brief that Dr. Allen was not asked whether intervention in 2006 would have made a difference. We respond to this notation by directing Plaintiffs to review Rule 56.06 of the Tennessee Rules of Civil Procedure.[7] When faced with a properly supported motion for summary judgment, Plaintiffs could have and should have offered evidence providing sufficient causation testimony. Plaintiffs failed to so respond.

Plaintiffs next argue that the court should not have limited Dr. Rast's opinions to what was presented in the prior suit. We again respond by directing Plaintiffs to Rule 56.06. Plaintiffs were most assuredly not limited to Dr. Rast's opinions in the prior suit.

---

[7] Rule 56.06 provides, in pertinent part, as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but his or her response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Plaintiffs simply failed to offer any new opinions for the court's consideration at the summary judgment stage. The court stated as such in its order that provides, in pertinent part, as follows:

> When Plaintiffs' counsel re-disclosed Dr. Rast in Graham 2 and pointed defense counsel to his deposition for his opinions, no mention was made of any additional causation opinions as to Dr. Weeks.

With all of the above considerations in mind, we conclude that the court properly found that Defendants were entitled to an award of summary judgment.

## V.    CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed equally to the appellants, Samuel L. Graham, Jr. and Velma Graham.

_____
JOHN W. McCLARTY, JUDGE