IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 23, 2017 Session

NEIGHBORS OF OLD HICKORY, ET AL. v. METROPOLITAN
GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE, ET AL.

Appeal from the Chancery Court for Davidson County
No. 16-301-IV     Robert E. Lee Davies, Senior Judge

_____

No. M2016-01815-COA-R3-CV

_____

This is a declaratory judgment action in which the plaintiff property owners sought a finding that the defendant's right to operate a rock quarry had not vested prior to the adoption of BL2015-13, which prohibits such activity on the property in question. All parties then moved for summary judgment as relevant to their respective positions. The trial court granted summary judgment in the defendant's favor, finding that the quarry qualified as a pre-existing nonconforming use. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J. and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Jason D. Holleman and Cleveland D. Bain, Nashville, Tennessee, for the appellants, Neighbors of Old Hickory, comprised of Jim Jester, Joe and Cheryl Coffey, Cory Sharp, James Sharp, Jeremy Spickard, and Anna Alexander.

Jon Cooper and J. Brooks Fox, Nashville, Tennessee, for the appellee, the Metropolitan Government of Nashville and Davidson County.

Thomas V. White and George A. Dean, Nashville, Tennessee, for the appellee, Industrial Land Developers, LLC.

# OPINION

## I. BACKGROUND

In 2014, Industrial Land Developers, LLC ("Defendant") purchased a 155 acre tract of land in Old Hickory, Tennessee with the intention of using the property as a rock quarry with asphalt and concrete batching plants. The property is zoned Industrial General ("IG"), which permits the most intensive industrial, manufacturing, and extractive uses in Davidson County. On December 4, 2014, Defendant wrote to William B. Herbert IV, the Metropolitan ("Metro") Zoning Administrator for Davidson County, requesting approval for the use of the property for mineral extraction with accessory uses, including rock crushing, screening, storage of explosive, concrete patching, and asphalt/cement mixing plants with an attached site plan setting forth Phases 1 and 2 of the project. Six days later, on December 10, Defendant's counsel wrote Mr. Herbert requesting issuance of a zoning permit and a certificate of zoning compliance. Counsel attached the final plans for the project, which established that Phase 1 included construction of the concrete batching and cement mixing plants, while Phase 2 included the construction of the quarry itself. The letter provided, in pertinent part, as follows:

> This letter is to request the issuance of a zoning permit and a certificate of zoning compliance . . . for the property . . . for use as mineral extraction, including accessory rock crushing, screening, storage of explosives, and in addition concrete batching and asphalt/cement mixing plants. This application is made pursuant to [Metro Code] §§ 17.40.520 & 17.40.530 (see attached). The property is zoned IG.
>
> Included herewith are our final development plans (site plan) for both Phase 1 and Phase 2 of the project. Phase 1 includes the accessory concrete batching and asphalt/cement mixing plants, and Phase 2 is the site of the quarry itself. Those plans are stamped by our engineer to indicate compliance with all Metro engineering requirements, and also included is a letter from our engineer confirming the same.

Five days later, on December 15, Mr. Herbert issued a certificate of zoning compliance pursuant to the Metro code and further advised as follows:

> The department is herewith issuing . . . a certificate of zoning compliance pursuant to [Metro Code] §§ 17.40.010 C & 17.40.520. My initial review seems to indicate that although a few other Metro departments will need to approve this use, those approvals should not be problematic. [You] may begin immediately to use the property for mineral extraction upon approval

- 2 -

of the other departments and issuance of the use permit. The operation of the quarry itself will not require the obtaining of any further Metro permit. Remember however that you must obtain a building permit for the construction of the facilities shown on Phase 1 of the Final Development Plan before actually beginning construction on that phase.

The property is classified as IG (general industrial) which allows the most intense use of land within the jurisdiction of the Metropolitan Government. This letter will also confirm that accessory uses typically associated with mineral extraction activities are also permitted at this location, including but not limited to, rock crushing, screening, storage of explosives, concrete batching and asphalt/cement mixing plants. These uses are permitted by right on this property under the heavy manufacturing use classification.

On February 11, 2015, Defendant filed an application with the Metro Department of Codes for a building permit for the construction of office and utility buildings. On April 24, they obtained the requested building permit from the Zoning Administrator to construct a 1,307 square foot office building and a utility building on the proposed site. Less than a month later, on May 15, the footings for the buildings were completed. On June 10, Defendant submitted an application for a "use and occupancy permit for new quarry" for the buildings. The same day, Defendant submitted an application for a National Pollution Discharge Elimination System ("NPDES") permit and certification approval with the Tennessee Department of Environment and Conservation. On June 29, the framing for the buildings was completed. A use and occupancy permit was issued for the quarry on August 7.

Thereafter, a hearing was held with regard to the operation of the quarry on August 10. Cory Sharp and Tim Jester, landowners with homes adjacent to the proposed quarry, appeared at the hearing and spoke in opposition. A temporary use and occupancy permit was issued for the buildings on the property on October 22.

At some point, Mr. Sharp and Mr. Jester, along with several other landowners, organized and formed Neighbors of Old Hickory (collectively "Plaintiffs") in an attempt to thwart Defendant's use of the property as a quarry. Plaintiffs sought assistance from Larry Hagar, their elected Metro Councilman. On November 20, with the support of Councilman Hagar, the Metropolitan Government of Nashville and Davidson County ("Metro Government") adopted BL2015-13, codified at M.C.L. § 17.16.130(C)(2), which added the following provision to the Metro Code:

No mineral extraction activity, including the transport of material extracted, shall occur within [1,250] feet of a residential structure, or within [2,000]

feet of the property line of a park or community education facility with the exception that residential structures, parks or community education facilities on the opposite side of navigable water ways shall be excluded from the setback requirement.

The zoning restriction prohibited construction of the rock quarry as planned because it was within 2,000 feet of a Metro park and within 1,250 feet of several private residences. On December 9, a final use and occupancy permit for the buildings was issued.

Plaintiffs filed an unverified complaint for a declaratory judgment and injunctive relief on March 28, 2016, naming Defendant and Metro Government as parties, in which they requested a finding that the proposed rock quarry was in violation of the zoning restriction. A verified complaint was filed on April 20. As pertinent to this appeal, Defendant responded with a motion for summary judgment with supporting affidavits and documentation establishing the aforementioned timeline of events preceding the filing of the complaint. Defendant asserted that it had obtained a vested right to a preexisting nonconforming use of the property as a quarry pursuant to the Tennessee Vested Property Rights Act ("VPRA") of 2014, codified at Tennessee Code Annotated section 13-4-310(b), which provides as follows:

> A vested property right shall be established with respect to any property upon the approval, by the local government in which the property is situated, of a preliminary development plan *or* a final development plan where no preliminary development plan is required by ordinance or regulation *or* a building permit allowing construction of a building where there was no need for prior approval of a preliminary development plan for the property on which that building will be constructed. During the vesting period . . . , the locally adopted development standards which are in effect on the date of approval of a preliminary development plan or the date of approval of a building permit, as described by this subsection (b), shall remain the development standards applicable to that property or building during the vesting period.

(Emphasis added.). Defendant further claimed that the following vesting provision found in the Metro Code also supported its position:

> Any permit issued before the effective date of the Zoning Code or subsequent amendment shall remain in effect provided that construction is begun within six months from the date of issuance of the permit. Construction shall mean physical improvements such as, but not limited to, water and sewer lines, and/or foundations have been developed on the site.

- 4 -

Clearing, grading, the storage of building materials, or the placement of temporary structures shall not constitute beginning construction.

M.C.L. § 17.04.030. Defendant explained that in addition to confirming its ability to use the property as a quarry, submitting development plans, and acquiring various permits, it had expended approximately $6.5 million dollars in the acquisition and activities necessary to pursue the quarry and accessory uses and that it had also leased a significant amount of equipment that had been moved to the site at a cost of $36,243.67 per week. Defendant anticipated revenue of approximately $64,500 per day once operations began. Metro Government filed a motion for summary judgment supporting Defendant's position. Plaintiffs then filed their own motion for summary judgment, claiming that Defendant had not obtained a vested right to a preexisting nonconforming use.

On June 15, 2016, the Department of Environment and Conservation for the State of Tennessee issued a National Pollution Discharge Elimination System ("NPDES") permit and certification approval, including the issuance of a mining permit.

The case proceeded to a hearing on the cross motions for summary judgment on July 21, 2016, after which the court granted summary judgment in favor of Defendant and Metro Government, finding that Defendant had obtained a pre-existing nonconforming use of the property as a quarry pursuant to Section 13-4-310(b) based upon the approval of the development plan and the building permit for the ancillary buildings prior to the passage of the zoning restriction. This timely appeal followed.

## II.   ISSUES

We consolidate and restate the issues on appeal as follows:

A.      Whether the court erred in granting summary judgment based upon a finding that Defendant obtained a vested right to a preexisting nonconforming use of the property as a quarry.

B.      Whether the court erred in finding that Defendant also obtained a vested right to accessory uses, namely the construction of an asphalt mixing plant and a concrete batching plant.

## III.   STANDARD OF REVIEW

The appropriate summary judgment standard to be applied is as follows:

[W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). When a properly supported motion is made, "the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in [Rule 56 of the Tennessee Rules of Civil Procedure], 'set forth specific facts' at the summary judgment stage 'showing that there is a genuine issue for trial.'" *Id.* at 265 (quoting Tenn. R. Civ. P. 56.06). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

"We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness." *Rye*, 477 S.W.3d at 250 (citations omitted). "In doing so, we make a fresh determination of whether the requirements of [Rule 56] have been satisfied." *Id.* (citations omitted). We must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008).

## IV.   DISCUSSION

### A. & B.

Prior to the passage of the VPRA in 2014, a property owner relying on a preexisting nonconforming use was required to show that business operations were either in operation at the time of the change or that the property owner had taken substantial steps or had incurred substantial liabilities in the construction prior to the change. *See generally Ready Mix, USA, LLC, v. Jefferson Cnty.*, 380 S.W.3d 52, 66-72 (Tenn. 2012) (upholding the trial court's finding that the property owner established a preexisting nonconforming use of the property for mining operations based upon measures taken to turn the property into an active mine). Following the enactment of the VPRA, the establishment of a preexisting nonconforming use was dependent upon the approval of a preliminary or final development plan or the acquisition of a building permit prior to the zoning change at issue. Tenn. Code Ann. § 13-4-310(b).

Plaintiffs argue that Section 13-4-310(b) must be read in pari materia with the common law and appears to further claim that Defendant must comply with both the common law and Section 13-4-310(b) to establish a vested property right. The legislature amended Section 13-4-310(b) to provide for the establishment of certain vested property rights not previously established through the common law or similar code provisions. S. B. 915, 108th Gen. Assemb., Reg. Sess. (Tenn. 2014). While this code section must be strictly construed, property owners need not establish compliance with both the common law *and* Section 13-4-310(b) to obtain a vested property right.

Here, Defendant primarily relied upon Section 13-4-310(b) in asserting that summary judgment was appropriate because it obtained a vested property right to the preexisting nonconforming use. The parties agreed that neither development plans nor building permits were required to establish a quarry in accordance with Metro and State law.[1] Section 13-7-101(a)(1) defines "quarrying" as "the extraction, removal and mechanized processing of stone, gravel, phosphate rock, metallic ore, limestone, marble, chert, sand, dimension stone . . . found in natural deposits in earth, for barter or sale." However, Defendant submitted development plans, including a final plan, and obtained a building permit for ancillary buildings for use in its quarrying operations. The final plan was approved by Mr. Herbert, the Zoning Administrator, as evidenced by the issuance of a certificate of zoning compliance in accordance with the Metro Code, which provides, in pertinent part, as follows:

> Final Approval by the Zoning Administrator. Prior to approval, the zoning administrator shall review final site plan applications in all zoning districts except those cited in subsection B of this section to verify conformance with the provisions of this title and any other applicable regulation. Final site plan applications shall be submitted in form and content established by the zoning administrator, and shall specifically describe the nature and

---

[1] Metro argues that the building permit was the only instrument that *could* operate to trigger the vesting provision because no preliminary development plan was required. This argument is inapposite to a fair reading of the statute, which provides, in pertinent part,

> A vested property right shall be established with respect to any property upon the approval, by the local government in which the property is situated, of a preliminary development plan *or* a final development plan where no preliminary development plan is required by ordinance or regulation *or* a building permit allowing construction of a building where there was no need for prior approval of a *preliminary* development plan for the property on which that building will be constructed.

Tenn. Code Ann. § 13-4-310(b) (emphasis added). Here, no preliminary development plan was required; therefore, either a final development plan or a building permit could operate to vest the preexisting nonconforming use.

scope of development to serve as the basis for the issuance of permits by the department of codes administration and any other applicable metro department.

M.C.L. § 17.40.170.

Plaintiffs argue that neither the site plan nor the building permits were adequate to sustain a vested right to a preexisting nonconforming use. Relative to the site plan, Plaintiffs rely upon Metro Resolution Number RS2014-1330, which provides, in pertinent part, as follows:

Section 4. The following types of applications shall be considered a Final Development Plan under the [VPRA]:

(A)    Subdivision Development Plan or Final Site Plan

(B)    Final Plat

(C)    Final Site Plan required by Section 17.40.170

Section 5. A Final Development Plan application shall include the boundaries of the site; significant topographical and other natural features affecting development of the site; the location on the site of the proposed buildings, structures and other improvements; the dimensions, including height, of the proposed buildings and other structures or a building envelope; and the location of all existing and proposed infrastructure on the site, including water, sewer, stormwater, roads and pedestrian walkways. Section 6. A Final Development Plan shall be approved by the adoption of minutes of the Planning Commission or administrative approval by the Planning Department or Zoning Administrator.

* * *

Section 9. The planning department or zoning administrator shall determine whether property rights have vested or have terminated in accordance with these provisions.

Plaintiffs note that the site plan submitted by Defendant was labeled, "Concept Plan" and that "[v]irtually none of the required items [were] included in the document" submitted to the Zoning Administrator for approval. As found by the trial court, the site plan submitted on December 4, 2014, "completely described for Metro the use of [the] land

for a quarry, the buildings to be constructed in conjunction with its use as a quarry, the location and dimensions of the buildings, and the location and perimeter of the quarry." This was all that was required to establish a vested right to the preexisting nonconforming use of the property as a quarry pursuant to Section 13-4-310(b).

Defendant also obtained a building permit for ancillary buildings necessary for its quarry operations. Here, the trial court considered the building permit issued on April 24, 2015, in conjunction with the use and occupancy permit for the quarry issued on August 7, 2015, which referenced the building permit, in finding that Defendant had also obtained a vested right to a quarry use through the building permit. Section 13-4-310(b) provides that a vested right to a preexisting nonconforming use may be obtained through either a building permit or development plans. A *building* permit was not obtained for the quarry itself. Any reliance upon the building permit for ancillary buildings was misplaced when such buildings were neither required nor sufficient to establish an entire quarrying operation. Accordingly, we conclude that the court erred in granting summary judgment on this ground. This finding does not merit reversal given our prior conclusion that a vested right was established through the approval of the site plan.

With all of the above considerations in mind, we conclude that the court did not err in granting summary judgment in favor of Defendant, finding that it had obtained a pre-existing nonconforming use of the property as a quarry pursuant to Section 13-4-310(b) based upon the approval of the development plan prior to the passage of the zoning restriction. In so concluding, we further reject Plaintiffs' arguments that a vested right to a preexisting nonconforming use was not established because the quarry was not in operation pursuant Section 13-7-208 or because the NPDES permit was not obtained prior to the change. Such is not required pursuant to Section 13-4-310(b).

This conclusion does not end our inquiry because Plaintiffs and Metro Government argue that Defendant did not obtain a vested right to certain accessory uses of the property, namely the requested construction of an asphalt mixing plant and a concrete batching plant, because the terms and conditions of the building permit only refer to a "new quarry." Defendant claims that its permit requests made clear that it was applying for approval of a quarry in an area zoned for such use, including specific accessory activities such as rock crushing, screening, storage of explosives, concrete batching, and asphalt mixing. We agree with Defendant. The final development plan, the approval of which we believe operated to vest the preexisting nonconforming use, included these nonconforming accessory uses. Accordingly, we further conclude that the court did not err in finding that these uses were also permissible. In so concluding, we need not address whether Defendant's right to operate the quarry vested pursuant to the common law or other provisions contained in the Metro Code.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellants, Neighbors of Old Hickory, comprised of Jim Jester, Joe and Cheryl Coffey, Cory Sharp, James Sharp, Jeremy Spickard, and Anna Alexander.

_____
JOHN W. McCLARTY, JUDGE